Mary M. TYNDALL, Plaintiff–Appellant,

v.

NATIONAL EDUCATION CENTERS, IN-CORPORATED OF CALIFORNIA, t/a Kee Business College Campus; National Education Centers, Incorporated, Defendants–Appellees.

No. 93–2511.

United States Court of Appeals, Fourth Circuit.

Argued May 10, 1994.

Decided Aug. 3, 1994.

---

**ARGUED:** Blackwell Nixon Shelley, Jr., Manning, Davis & Kirby, Richmond, VA, for appellant. Donald Lester Creach, Hunton & Williams, Richmond, VA, for appellees.

Before RUSSELL and WILKINSON, Circuit Judges, and CHAPMAN, Senior Circuit Judge.

Affirmed by published opinion. Circuit Judge WILKINSON, wrote the opinion, in which Circuit Judge DONALD RUSSELL and Senior Circuit Judge CHAPMAN joined.

## OPINION

WILKINSON, Circuit Judge:

The question in this case is whether an employer violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, by discharging a disabled employee who was frequently absent from work due to her disability and the disability of a family member. Because plaintiff was unable to meet the attendance requirements of her job, despite her employer's efforts to accommodate her disabling condition, we hold that she was not a "qualified individual with a disability" protected by the ADA. *See* 42 U.S.C. § 12112(a). In addition, we find that plaintiff failed to overcome the strong inference of nondiscrimination arising from the fact that the same individual who discharged her had hired her with full knowledge of her disability only two years earlier. We accordingly affirm the district court's grant of summary judgment to the employer.

### I.

Plaintiff Mary Tyndall suffers from lupus erythematosus, an autoimmune system disor-

der that causes joint pain and inflammation, fatigue, and urinary and intestinal disorders. In 1989, Tyndall enrolled in a career training program in medical assisting at the Kee Business College Campus ("Kee"), a school in Richmond, Virginia owned by defendant National Education Centers ("NEC"). Tyndall successfully completed her coursework in January 1990. At that time, Dale Seay, the head of Kee's Allied Health Department, hired Tyndall as a parttime instructor in the medical assisting program. Seay and the other Kee staff members knew of Tyndall's disability when she was hired.

During Tyndall's tenure at Kee, the school made every effort to accommodate her lupus condition. Kee permitted Tyndall to take sick leave, to come into work late or leave early, and to take breaks from ongoing classes whenever she felt ill. If Tyndall became ill during the work day, Seay and other colleagues would accompany her to the rest room to help her, and would offer her a ride home. Indeed, Tyndall admitted that she never made a request for accommodation of her lupus condition that Kee refused.

In 1992, Tyndall began missing work with increasing frequency. From January until July 15, 1992, she missed nineteen days of work: one day to help a friend with legal work, ten days because of her lupus condition, and eight days to take care of her son, Kevin, who suffered from gastro-esophageal reflux disease. Kee approved each of those absences. However, Seay mentioned in a meeting with Tyndall that she had been missing a lot of work.

In mid-July, Tyndall submitted a request for a leave of absence from July 23 to August 17, 1992, because her son was undergoing surgery in Birmingham, Alabama. Again, Kee approved the leave of absence. On August 10, after returning home from Birmingham, Tyndall called Seay to confirm that she would return to work on August 17 as scheduled. However, she informed Seay that she would need to take off more time in order to take care of her son's post-operative problems. Seay responded by asking Tyndall to meet with her and Zoe Thompson, the Executive Director of Kee, regarding the addition-

al leave of absence. That meeting took place on August 12.

At the meeting, Tyndall stated that she could teach for a week beginning August 17 before taking more time off to accompany her son on a post-operative trip to Birmingham. Tyndall said she was not sure how long she would be gone on that trip. Seay told Tyndall that she could return to work on August 17 as scheduled and continue to work, but that she could not take additional time off. Seay explained that the additional leave of absence would cause Tyndall to miss the beginning of an instructional cycle for the third time in a row. Because students in Tyndall's classes and teachers who had to work overtime to cover her classes had complained about her absences, Seay was concerned that another absence would further disrupt the operations of the school. When Tyndall insisted that she had to take her son to Birmingham, Seay suggested that Tyndall resign because of everything that was going on in her life. Seay prepared a report explaining that the separation was "mutual," and Tyndall signed it. Before Tyndall left the meeting, Thompson encouraged her to apply to Kee for re-employment when she was ready to return to work.

Later in August, Tyndall filed a claim with the EEOC contending that NEC and Kee violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. The EEOC issued a determination that the evidence did not establish a violation of the ADA. In May 1993, Tyndall filed a four-count complaint against NEC in Virginia federal court. The complaint alleged that (1) NEC discriminated against her based on her known association with her disabled son, see 42 U.S.C. § 12112(b)(4), (2) NEC failed to make reasonable accommodations for her disability prior to her termination, see 42 U.S.C. § 12112(b)(5)(A), (3) NEC discriminated against her based on her own disability in terminating her, see 42 U.S.C. § 12112(b)(5)(B), and (4) NEC violated the Virginians with Disabilities Act ("VDA"), Va. Code § 51.5–41, in terminating her and in failing to make reasonable accommodations for her disability.

In October 1993, the district court granted summary judgment to NEC on all four counts. With respect to Counts One and Three, the federal ADA discrimination claims, the court found that NEC articulated a nondiscriminatory reason for terminating Tyndall—namely, that her frequent absences were disruptive to Kee's operations—and that Tyndall could offer no proof that this articulated reason was a mere pretext for discrimination. The court dismissed Count Two, the reasonable accommodations claim, on the ground that Tyndall herself admitted that NEC had never refused any request for accommodation. Finally, the court dismissed Count Four on the ground that the VDA does not apply to NEC.

Tyndall now appeals the district court's summary judgment rulings on Counts One and Three, the federal ADA discrimination claims, and Count Four, the state VDA claim. We address each issue in turn.

## II.

Tyndall first challenges her termination under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual. . . ." 42 U.S.C. § 12112(a). In order to establish a violation of this section, three criteria must be met: first, Tyndall must have a "disability"; second, Tyndall must be "qualified" for the job; and third, Kee's termination of Tyndall must constitute an unlawful "discrimination" based on her disability. Because it is undisputed that Tyndall's lupus condition constituted a "disability" under the ADA, we need address only the latter two elements.

## A.

Under the ADA, only persons who are "qualified" for the job in question may state a claim for discrimination. The ADA defines "qualified individual with a disability" as

an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the em-

ployment position that such individual holds or desires.

42 U.S.C. § 12111(8).[1] The Supreme Court has interpreted this provision to mean that a "qualified" person must be "able to meet all of a program's requirements in spite of his handicap." *Southeastern Community College v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). Accordingly, to determine whether Tyndall was qualified for the teaching position, we must decide (1) whether she could "perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue," and (2) if not, whether "any reasonable accommodation by the employer would enable [her] to perform those functions." *Chandler v. City of Dallas*, 2 F.3d 1385, 1393–94 (5th Cir.1993). Plaintiff bears the burden of demonstrating that she could perform the essential functions of her job with reasonable accommodation. *See Lucero v. Hart*, 915 F.2d 1367, 1371 (9th Cir.1990).

■ Tyndall contends that she was qualified for her job because she could perform all of her teaching duties and received "excellent" and "good" performance evaluations at Kee. We agree, and NEC does not dispute, that the quality of Tyndall's performance when she was working was more than adequate. However, an evaluation of the quality of Tyndall's performance does not end our inquiry. In addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular basis. Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee "who does not come to work cannot perform *any* of his job functions, essential or otherwise." *Wimbley v. Bolger*, 642 F.Supp. 481, 485 (W.D.Tenn.1986), *aff'd*, 831 F.2d 298 (6th Cir.1987). Therefore, a regular and reliable level of attendance is a necessary element of most jobs. *See, e.g., Carr v. Reno*, 23 F.3d 525, 529 (D.C.Cir.1994) (holding that "coming to work regularly" is an "essential function"); *Law v. United States Postal Serv.*, 852 F.2d 1278, 1279–80 (Fed.Cir.1988) (holding that attendance is a minimum function of any job); *Walders v. Garrett*, 765 F.Supp. 303, 309 (E.D.Va.1991) (holding that "reasonably regular and predictable attendance is necessary for many [jobs]"), *aff'd*, 956 F.2d 1163 (4th Cir.1992); *Santiago v. Temple Univ.*, 739 F.Supp. 974, 979 (E.D.Pa.1990) ("attendance is necessarily the fundamental prerequisite to job qualification"), *aff'd*, 928 F.2d 396 (3d Cir.1991). An employee who cannot meet the attendance requirements of the job at issue cannot be considered a "qualified" individual protected by the ADA. *See Carr*, 23 F.3d at 529–30; *Walders*, 765 F.Supp. at 314; *Santiago*, 739 F.Supp. at 979.

■ Here, Tyndall held a job that could not be performed away from the Kee campus; her position required that she teach the assigned courses during the scheduled class times and spend time with her students. Despite this obvious need for regular attendance, Tyndall missed almost forty days of work during a seven-month period. Moreover, she missed the beginning of an instructional cycle twice in a row and requested permission to be absent for yet a third time, even though the start of an instructional period is a crucial time for Kee's operations. Accordingly, regardless of the fact that she possessed the necessary teaching skills and performed well when she was at work, Tyndall's frequent absences rendered her unable to function effectively as a teacher. *See Matzo v. Postmaster Gen.*, 685 F.Supp. 260, 263 (D.D.C.1987) (holding that a legal secretary's poor attendance rendered her unqualified for her job, even though she possessed fine secretarial skills), *aff'd*, 861 F.2d 1290 (D.C.Cir.1988).

1. This language tracks the definition of "qualified individual with handicap" under the Rehabilitation Act of 1973. *See* 29 C.F.R. § 1614.203(a)(6) (defining "qualified individual with handicap" as "an individual with handicaps who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others"). Because the ADA expressly requires its provisions to be interpreted in a way that "prevents imposition of inconsistent or conflicting standards for the same requirements" under the two statutes, 42 U.S.C. § 12117(b), we rely on case law interpreting the Rehabilitation Act's "qualified" requirement in determining whether Tyndall was "qualified."

Furthermore, Kee's extensive accommodations of Tyndall's lupus condition did not improve her attendance level. From the beginning of Tyndall's tenure at Kee, Seay permitted her to take sick leave, come into work late, leave early, and take mid-class breaks when necessary to alleviate her condition. Despite the numerous attempts to assist her, Tyndall continued to miss an excessive number of days from work. Indeed, Kee's accommodations of Tyndall's disability could not have significantly improved Tyndall's attendance level, as a majority of her absences were not related to her own disability. Rather, they were caused by her personal need to tend to her son's disability, which an employer is not obligated to accommodate through scheduling modifications. *See* 29 C.F.R. § 1630, App. ("[A]n employee would not be entitled to a modified work schedule as an accommodation to enable the employee to care for [a family member] with a disability."). Because Tyndall's attendance problems rendered her unable to fulfill the essential functions of her job, and because these problems occurred even with Kee's more than reasonable accommodations for her own disability, we hold that she was not a "qualified individual with a disability," as required by § 12112(a) of the ADA.

### B.

Even if Tyndall were a "qualified" employee covered by the ADA, she nonetheless could not recover under the Act because she has failed to show that Kee in any way discriminated against her. Tyndall alleges that Kee discriminated against her in two different ways, but neither of her claims has merit.

First, Tyndall contends that Kee's termination constituted discrimination based on her association with her disabled son. The ADA prohibits employers from taking adverse employment action "because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). More specifically, the Interpretive Guidelines to the ADA provide that an employer may not make decisions based on the "belie[f]" that the [employee] would

have to miss work" in order to take care of a disabled person. 29 C.F.R. § 1630, App. Tyndall contends that Seay's decision to terminate her stemmed from the assumption that Tyndall would have to take additional time off in order to take care of her disabled son, Kevin.

■ We find no merit in this argument. Seay did not make an unfounded assumption that Tyndall would have to miss work to take care of Kevin. Rather, Seay responded to Tyndall's record of extended absences in connection with Kevin's care and her actual statement that she would, in fact, have to miss additional work in order to be with her son. It is undisputed that when Seay informed Tyndall she could not take another leave of absence at the start of an instructional cycle, Tyndall replied that she had to take Kevin back to Birmingham for post-operative treatment. The ADA does not require an employer to restructure an employee's work schedule to enable the employee to care for a relative with a disability. *See* 29 C.F.R. § 1630, App. Because Tyndall's termination was not based on any assumption regarding future absences related to Kevin's care, but instead resulted from her record of past absences and her clear indication that she needed additional time off, we hold that Kee's actions did not constitute discrimination based on Tyndall's association with a disabled individual.

Second, Tyndall maintains that even if Kee did not discriminate against her based on her association with her son, Kee's termination violated § 12112(b)(5)(B), which prohibits employers from taking adverse employment action "based on the need of [the employer] to make reasonable accommodation to the physical or mental impairments of the employee or applicant." 42 U.S.C. § 12112(b)(5)(B). In evaluating Tyndall's claim that her disability was a motivating factor for her termination, we must focus on the undisputed fact that Seay, the person responsible for terminating Tyndall, is the same person who hired Tyndall with full knowledge of her disability. *See Proud v. Stone,* 945 F.2d 796, 797 (4th Cir.1991). In *Proud,* this court noted that "[w]hen the hirer and firer are the same individual, there

is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer...." *Id.* at 798; *see Mitchell v. Data General Corp.*, 12 F.3d 1310, 1318 (4th Cir.1993) (same). At least two other circuits have taken a similar view, holding that employees who were discharged by the same person who had earlier hired or promoted them were not victims of age discrimination. *See LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 847 (1st Cir.1993); *Lowe v. J.B. Hunt Transport, Inc.*, 963 F.2d 173, 174–75 (8th Cir.1992).

 While *Proud* addressed a claim of age-based discrimination, the strong inference of nondiscrimination when the hirer and firer are the same person applies to disability discrimination claims as well. An employer who intends to discriminate against disabled individuals or holds unfounded assumptions that such persons are not good employees would not be apt to employ disabled persons in the first place. *See Proud*, 945 F.2d at 797. Moreover, recognizing a strong inference of nondiscrimination in same hirer/firer situations advances the primary purpose of the ADA: to encourage employers to take on qualified individuals, regardless of their disability. The inference of nondiscrimination accords credit to employers who abide by the statute and hire individuals with disabilities, and thereby avoids the "grave risk that employers who otherwise would have no bias against [disabled] workers will now refuse to hire them in order to avoid meritless but costly [ADA] actions." *Id.* at 798. Here, Seay not only hired Tyndall, but actively encouraged her to apply for the teaching position at Kee, despite having full knowledge of her lupus condition. Seay fully accommodated Tyndall's disability during her employment with Kee, and discharged Tyndall only when informed that she had to take an indefinite amount of time off just a week after returning from a leave of absence nearly a month long. These undisputed facts create a strong inference that Tyndall's termination was not motivated by bias against disabled workers or by a desire to avoid making reasonable accommodations for Tyndall's disability.

Viewed against this strong presumption of nondiscrimination, Tyndall's evidence is plainly inadequate to establish that discrimination motivated her termination. Tyndall relies on three pieces of evidence to argue that considerations of her disability played a role in Kee's decision: (1) after Tyndall returned from a sick leave in July, Seay warned Tyndall that she was missing a lot of time from work; (2) at the August 12 meeting at which Tyndall was terminated, Seay commented that Tyndall "didn't sound too great" and asked if she was doing okay, and (3) at the same meeting, Thompson told Tyndall that her health and the health of her family seemed more important than her job. Far from disclosing discriminatory motive, however, these statements are unexceptional remarks regarding Tyndall's work performance or general welfare. Seay's comment about Tyndall "not sounding great," for example, was prompted by Tyndall's cold symptoms, not by her disability. More basically, an employer must feel free to explore workplace problems with an employee without fear of making actionable statements at every turn. The civil rights laws prohibit discrimination, not discussion. The ADA does not discontinue the dialogue on problems such as substandard job performance or absence from work.

### III.

 Tyndall next contends that Kee violated the Virginians with Disabilities Act ("VDA"), VA. CODE § 51.5–40 *et seq.*, by failing to make reasonable accommodations to her disability and by terminating her. The VDA provides, in relevant part, that

A. No employer shall discriminate in employment or promotion practices against an otherwise qualified person with a disability solely because of such disability....

C. An employer shall make reasonable accommodation to the known physical and mental impairments of an otherwise qualified person with a disability....

VA. CODE § 51.5–41. The VDA does not, however, prohibit employers from taking adverse employment action against an unqualified person, *i.e.*, an employee "who, because of his disability, is unable to adequately perform

his duties...." Vᴀ. Cᴏᴅᴇ § 51.5–41(D). The VDA standards for liability follow the standards established in the federal Rehabilitation Act of 1973 and adopted in the ADA. *See Eastman v. Virginia Polytechnic Institute,* 732 F.Supp. 665, 666 (W.D.Va.1990), *aff'd on other grounds,* 939 F.2d 204 (4th Cir.1991). Accordingly, for the reasons set forth in our analysis of Tyndall's ADA claims, we hold that Tyndall's VDA claims must also fail.[2]

## IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

**2.** The district court dismissed Tyndall's VDA claim on the ground that the VDA does not apply to NEC. Because we hold that Tyndall's evidence is insufficient to establish a VDA violation, we have no occasion to address whether the VDA applies to NEC.