Frank D. SHIFLETT, Plaintiff,

v.

GE FANUC AUTOMATION CORP., et al., Defendants.

Civil Action No. 95–0073–C.

United States District Court, W.D. Virginia, Charlottesville Division.

April 21, 1997.

Dexter Brock Green, Jones & Green, Charlottesville, VA, Arthur H. Blitz, Hope B. Eastman, Parley, Rothman, Goldstein, Rosenberg & Cooper, Bethesda, MD, for Plaintiff.

Robert Craig Wood, McGuire, Woods, Battle & Boothe, Charlottesville, VA, for Defendants.

## MEMORANDUM OPINION

MICHAEL, Senior District Judge.

On February 12, 1997, United States Magistrate Judge B. Waugh Crigler conducted a hearing on defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. In an Order incorporating findings made from the bench, the Magistrate recommended dismissal of Plaintiff Frank D. Shiflett's claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* and plaintiff's claim under Virginia state law for negligent infliction of emotional distress. *See* Order of February 19, 1997. Plaintiff does not object to the Magistrate's dismissal of his state law claim against the corporate and individual defendants,[1] and this court finds that the Magistrate correctly dismissed plaintiff's state law claim. Plaintiff concedes that Defendant GE Fanuc Automation Corporation, a holding company, is not a proper party in this suit. Hence, only plaintiff's ADA claims against GE Fanuc Automation Corporation North America, Inc. ("GE Fanuc") are now before the court. For the reasons stated below, the court grants GE Fanuc's motion for summary judgment on plaintiff's ADA claims.

---

1. The individual defendants are GE Fanuc Senior Vice President for Employee and Public Relations Donald Borwhat, GE Fanuc Senior Vice President of Finance Lawrence Pearson, GE Fanuc then Manager of Finance Systems Thomas McGinnis, plaintiff's immediate supervisor, Sheron Lamb, and Sheron Lamb's supervisor, Keith Chambers.

## I. FACTUAL BACKGROUND

Plaintiff, a former employee of GE Fanuc, suffers from a moderately severe to severe sensorineural hearing loss. Plaintiff claims that he was harassed, denied various job benefits, and eventually discharged all because of his disability, in violation of the ADA.

### A. TERMINATION

Plaintiff worked at GE Fanuc as a printer from 1980–1982, until he was laid off. In 1983, GE Fanuc rehired him to work as a computer operator, where he was employed until March 1994. According to GE Fanuc, plaintiffs discharge was unrelated to his disability, but rather was the result of aggressive misconduct on plaintiff's part. GE Fanuc claims that a heated quarrel with his immediate supervisor, Sheron Lamb, triggered plaintiff's termination. The parties disagreed about whether plaintiff should be credited with an additional hour of work. Although both plaintiff and Ms. Lamb agree about the substance of the dispute, their descriptions of plaintiff's behavior differ drastically. Alternatively—and inconsistently—plaintiff attributes the discrepancy to fabrication or to misunderstanding on Ms. Lamb's part. Plaintiff claims that he first spoke to Ms. Lamb about the contested hour in a computer room; subsequently, he went to her office to continue the discussion. While he characterizes the argument in the computer room as somewhat heated (attributing the emotion to Ms. Lamb), plaintiff tells a tale of calm and serene dialogue between himself and Ms. Lamb once he entered her office. Under Ms. Lamb's version of the story, plaintiff entered her office to complain about the contested hour, blocked the only open passage available to her, and, when she attempted to speak, became irrational, angry, threatening, and yelled at her. Ms. Lamb describes plaintiff's behavior as "abusive, intimidating, threatening and generally insubordinate." Defs'. Exhibit 38. As another employee verified, the incident brought her to tears. Contemporaneous E–Mail addressed to her supervisors documented Ms. Lamb's version of events and demanded immediate action be taken against plaintiff.

Marybeth Sullivan–Rose, GE Fanuc's Manager of Human Resources, who was hitherto largely unacquainted with plaintiff, conducted an investigation of the altercation. In the course of her investigation, Ms. Sullivan–Rose discovered a paper trail documenting a history of misconduct on plaintiff's part. Ms. Lamb had reprimanded plaintiff twice, once for unauthorized use of overtime and another time for "disorderly and willful insubordination," which included use of "demeaning language, yelling, and physically intimidating a supervisor." Defs'. Exhibits 13, 22. GE Fanuc Senior Vice President for Employee and Public Relations, Donald Borwhat, had reprimanded plaintiff for "inappropriate and totally unacceptable" behavior towards female colleagues (e.g., sexual harassment). Defs'. Exhibit 29. GE Fanuc then Manager of Information Systems, Thomas McGinnis, had reprimanded plaintiff for "harassment of a supervisor." Defs'. Exhibit 29. On every occasion, plaintiff signed a document acknowledging the citation for misconduct;[2] in

---

**2.** Plaintiff denies each documented instance of misconduct on his part and even refuses to admit to having signed some of the letters accusing him of misconduct, although, at the same time, he is reluctant to issue an outright denial.

Q [Defense counsel]:You signed it [the letter indicating that your conduct toward female co-workers was inappropriate], didn't you?

A [plaintiff]: No, I'm not agreeing with that.

Q Are you denying under oath that this is your signature?

A: No, to the best of my knowledge, that Frank could be mine, with the exception of the K. The Shiflett is mine. And the D is not mine. The D is not mine. I never write script and print. And I don't think I know of anybody who is going to be scripting and then turn around and print and then script. That just don't cut it, Mr. Woods [Defense counsel].

Q: I will ask you one more time, under oath, are you denying that this is your signature ? Yes or no?

A: To the best of my knowledge, it could be, it could not be.

. . .

Q: Is that your signature on this document or not?

A: To the best of my knowledge, it could be or it could not be.

Q: That's not an acceptable answer, sir. Is that your signature?

. . .

each instance, plaintiff was warned that recurrence could lead to termination. The charge of sexual harassment nearly led to plaintiff's discharge; however, (as plaintiff admits) Ms. Lamb intervened on his behalf, and plaintiff was not fired.

After considering plaintiff's troubled employment history and interviewing plaintiff, Ms. Lamb, and other employees, Ms. Sullivan–Rose, in concert with a handful of GE Fanuc's management officials, decided to terminate plaintiff.

### B. JOB DETRIMENTS OTHER THAN TERMINATION

Plaintiff contends that, apart from his termination, GE Fanuc discriminated against him because of his hearing disability by (1) giving him poor performance appraisals, with the consequence that he was placed on a special monitoring schedule which prevented him from posting for new jobs, (2) refusing to permit him to return to a more favorable work shift, and (3) denying him entry into training classes. Further, plaintiff maintains that GE Fanuc failed to provide him with a reasonable accommodation for his hearing loss.

### 1. PERFORMANCE EVALUATIONS

Although plaintiff received only one "below satisfactory" job evaluation during the course of his employment with GE Fanuc, several performance evaluations criticized plaintiff's communication and listening skills. For instance, the "below satisfactory" assessment, made in August 1992 by Ms. Lamb, indicated that "Frank does not listen, can be uncooperative and performs well below what is expected of an operator with his experience.... Frank's oral/written communication skills are poor resulting in his assistance to his customers being poor. ...." Defs'. Exhibit 19. This evaluation also noted plaintiff's recurring misconduct problems. Another evaluation, composed in 1993, faulted plaintiff for his "tendency to be in a hurry and not take the time to really listen and consequently [to]

make[ ] mistakes or [to] relay[ ] incorrect information. In order to improve Frank's listening skills, he must remain calm and concentrate on what is being said. If necessary he might wish to repeat back to ensure he understands. Frank needs to make certain he understands what is require [sic] of him." Pl's. Exhibit W.

As a result of the "below satisfactory" review, GE Fanuc placed plaintiff on a monitoring schedule pursuant to which his performance was to be reviewed every 90 days. Consequently, plaintiff was not permitted to apply for other jobs within the company after August 1992. Plaintiff and GE Fanuc disagree about the reason plaintiff was placed on the monitoring schedule. Plaintiff contends that his communication problems triggered the monitoring. GE Fanuc insists plaintiff's misconduct prompted it to begin monitoring him, pointing to the document memorializing the decision to subject plaintiff to special monitoring, which states as follows:

> In order to monitor Frank's performance he will be temporarily assigned to first shift. Frank needs to make sure he takes the two disciplinary letters [regarding his harassment of women and improper use of overtime] in his file seriously. He should not make light of them.

Pl's. Exhibit V.

### 2. WORK SHIFT TRANSFER

Despite his previous statement in 1990 that his "situation [relating to the shifts] ... had [no] ... connection with his hearing loss," Defs'. Exhibit 12, plaintiff claims that GE Fanuc declined to return him from the "second shift" to the "first shift" because of his hearing problem. On first shift, plaintiff worked as an operator. He was moved to second shift temporarily, to receive computer training After his training was completed, GE Fanuc offered to transfer him back to his original job, but he refused because plaintiff wanted a computer job. In 1990, when a permanent computer job became available on first shift, GE Fanuc considered plaintiff for

A: Mr. Wood [Defense counsel], what you interpret as an answer, what I interpret as an answer could be two different things. We live in two different worlds. Shiflett Dep. at 323–25.

This type of dialogue is repeated several times throughout the deposition.

the job, but gave it to an individual whom they considered more qualified. Plaintiff controverts this assertion, contending that GE Fanuc refused to transfer him from second shift to first shift because the latter was nosier than the former and they believed his hearing impairment would interfere with his ability to perform in the nosier setting.

### 3. TRAINING SESSIONS

Plaintiff charges that GE Fanuc effectively denied him the opportunity to attend training sessions because Ms. Lamb and other coworkers responded to his queries about training with comments such as, "[W]hy would [you] want to go; you can't understand what we're saying anyway." Shiflett Dep. at 63. GE Fanuc denies plaintiff was ever barred from attending training sessions, and plaintiff concedes neither Ms. Lamb nor other superiors ever told him that he was not allowed to attend training sessions.

### 4. REASONABLE ACCOMMODATION

Plaintiff maintains that he requested four accommodations: (1) that he be provided a better phone amplifier; (2) that a louder phone ringer be installed in the computer and printer rooms; (3) that other employees speak slowly to him; and (4) that other employees tell him if he started speaking too loudly.

Ms. Lamb confirms that plaintiff asked for a louder ringer to be installed in the computer room and indicated that she had a louder ringer installed there. Ms. Lamb denies, however, that plaintiff ever requested another ringer to be installed in the printer room, and GE Fanuc contends that the only other accommodation plaintiff ever requested was a better phone amplifier. That plaintiff made no other requests is supported by parts of his deposition testimony and his sworn statement to the Equal Employment Opportunity Commission ("EEOC"), which contains an explicit concession by plaintiff that he asked for nothing but a phone amplifier. In his deposition testimony, plaintiff agreed that so long as he was given a good phone and amplifier he could perform his job without difficulty. Ms. Lamb testified that, in response to plaintiff's complaints about the amplifier, she

would get the amplifier cleaned, and plaintiff would indicate that he was satisfied with the result. In 1990, in the midst of the dispute over being assigned to the second shift, plaintiff gave written notice to GE Fanuc that he suffered from hearing loss. He accused GE Fanuc of "trying to use the fact that I have a hearing loss to substantiate your position." Defs'. Exhibit 9. GE Fanuc responded as follows.

> You mentioned that you believed your situation was caused by your hearing loss. You have never identified yourself in our records as having a hearing loss that would require any special consideration on our part If you wish to be considered handicapped, you should go to Health Services for an evaluation.

Defs'. Exhibit 11 (Letter dated April 26, 1990).

Plaintiff replied that

> I did not indicate my situation had any connection with my hearing loss. As a matter of fact until my previous meeting with you I don't think my hearing loss has ever been mentioned. At the time you asked if I wanted to be listed as handicapped. I asked if it would be to my advantage? I did not sign any consent form nor did I bring up the subject. Did you have a particular reason for wanting me listed as handicapped? I have no reason to feel handicapped, since I am a graduate of DTI/VPI and have completed approximately three fourths of my requirements for an associate Degree at PVCC. Considering my achievements I think it is inappropriate to mention or imply that I am handicapped.

Defs'. Exhibit 12 (Letter dated April 27, 1990).

One year later, plaintiff had a change of heart. On March 12, 1991, he filled out a form for affirmative action consideration, claiming he suffered from a disability, specifically, hearing loss. The form asked for a list of "accommodations which could be made to enable you to perform your job." Defs'. Exhibit 16. Plaintiff's only response consisted of the following: "I use a telephone with an amplifier on it to help understand callers

better, especially in a noisy area such as the computer area. I wear a hearing aid to correct: my hearing loss." Defs'. Brief at 13 (quoting Shiflett Dep. Exhibit 16). Based on this information, GE Fanuc requested that plaintiff visit its medical center. Plaintiff refused, and no further action was taken.

## C. DISABILITY-BASED HARASSMENT

According to plaintiff, from the late 1980s up to the time he was discharged he endured taunting by GE Fanuc (supervisory) employees in connection with his hearing problem. Primarily implicated in this conduct are Ms. Lamb and Keith Chambers, Ms. Lamb's immediate supervisor. The alleged mockery consisted of employees laughing at plaintiff's request for a phone amplifier, informing plaintiff of his communication problems in a calculatingly demeaning manner, and "giving [plaintiff] all kinds of signs, [and saying] phone's ringing, turning your hearing aid up, is your hearing aid working, you need a new battery, you didn't understand me." Shiflett Dep. at 62–63. Plaintiff also interprets GE Fanuc's failure to provide him with a reasonable accommodation and GE Fanuc's evaluations, discussing his communication problems, as disability-based harassment. Finally, to support his harassment claim, plaintiff relies upon GE Fanuc employee statements indicating that it would be fruitless for him to attend training sessions because of his hearing impairment.

## II. APPLICABLE LAW

### A. SUMMARY JUDGMENT

Under Fed.R.Civ.P. 56(c), a party is entitled to summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue of as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.; Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All facts and reasonable inferences that can be drawn from the facts must be interpreted in the light most favor-

able to the nonmoving party; however, a mere scintilla of evidence is insufficient to survive a motion for summary judgment. *Barwick v. Celotex Corp.,* 736 F.2d 946, 958–59 (4th Cir.1984). The party who bears the burden of proof on a given claim must offer admissible evidence on each element of that claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

### B. ADA

### 1. INTRODUCTION

The ADA's core liability provision provides as follows:

No covered entity [3] shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

Discrimination includes, inter alia, classifying employees based on disability so that their job opportunities are adversely affected, § 12112(b)(1), and failing to provide reasonable accommodations to otherwise qualified disabled persons, § 12112(b)(5)(A). A disability is defined, with respect to an individual, as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual; ... a record of such an impairment; or ... being regarded as having such an impairment." *Id.* § 12102(2). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires...." *Id.* § 12111(8). A "'reasonable accommodation' may include ... making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and ... job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifica-

**3.** There is no dispute that GE Fanuc is a covered entity.

tions of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." *Id.* § 12111(9).

## 2. PRIMA FACIE CASE OF UNLAWFUL TERMINATION

■ The Fourth Circuit has established two alternative proof schemes for claims of unlawful firing under the ADA. *See EEOC v. Kinney Shoe Corp.,* 917 F.Supp. 419 (W.D.Va.1996) (Michael, J.), *aff'd,* 104 F.3d 683 (4th Cir.1997). The first comes into play when the employer admits that alleged disability played a role in the employee's discharge. This organizational framework, developed in *Tyndall v. National Education Centers,* 31 F.3d 209 (4th Cir.1994), requires the plaintiff to show (1) that he suffers·from a disability within the meaning of the ADA; (2) that he is otherwise qualified; and (3) that he suffered adverse employment action on the basis of disability in violation of the ADA. If, however, the employer claims that the discharge was unrelated to any alleged disability, a burden-shifting scheme akin to that established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) applies. As *Ennis v. NABER,* 53 F.3d 55, 58 (4th Cir.1995) sets out, an employee must then show: (1) that he is protected under the ADA; (2) that he was terminated; (3) that his job performance at the time of discharge met the legitimate expectations of his employer; and (4) that the circumstances under which the discharge occurred give rise to a reasonable inference of unlawful discrimination. If the employee successfully makes out a prima facie case under *Ennis,* the burden shifts to the employer, who must adduce a legitimate nondiscriminatory reason for the discharge. Once such a reason is articulated, the burden shifts to the employee to demonstrate that the reason given is pretextual and that the real reason is discriminatory. *Ennis,* 53 F.3d at 58 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

Although GE Fanuc has disclaimed any reliance on plaintiff's hearing impairment in explaining his termination, plaintiff nonetheless insists that the proof scheme developed in *Tyndall* applies. Plaintiff argues that "when the factual link between the employee's disability and his termination in fact exists but the employer refuses to acknowledge it [the analysis in *Tyndall* should govern]." Pl's. Objections at p. 7. Plaintiff forgets that in *every* ADA case, the employee claims that a factual link exists between the employee's disability and the termination; hence, it must be up to the employer to determine which test is appropriate, that in *Ennis* or that in *Tyndall.* To the extent that plaintiff worries that "choosing" the proof scheme will give GE Fanuc or other employers some type of strategic advantage, this concern is unwarranted. Proof schemes simply aid litigants and courts by imposing some order on their analysis of employment discrimination claims. But accepting a certain methodology does not necessarily entail slavish obeisance to multi-prong tests; common sense ought not be thrown to the wind. *See Blankenship v. Warren County Sheriff's Dep't,* 939 F.Supp. 451, 459 (W.D.Va.1996) (Michael, J.) (citing *Moore v. City of Charlotte,* 754 F.2d 1100, 1105 (4th Cir.1985)). Courts use one proof scheme as opposed to another because the selected method is better-tailored to the particular case at hand. If it becomes apparent that the employee has presented sufficient evidence of unlawful discrimination, the fact that a certain prong of any given proof scheme is not met should not defeat the employee's claim. Ultimately, the outcome of a case should not turn on which organizational framework has been relied upon. The circumstances of this case render it appropriate to proceed under *Ennis,* which the court believes to be best-suited to this case. Plaintiff should rest assured, however, that the court will not lose sight of the forest for the trees.

### a. PROTECTED CLASS

■ The Fourth Circuit has held that the determination whether an individual is disabled within the meaning of the ADA must be made on a case-by-case basis. *Ennis,* 53 F.3d at 59. Progressing a step further, the Fourth Circuit has expressly rejected the notion that an individual can be per se disabled under the ADA. *Id.* at 60. Each ADA

plaintiff must show that his disability qualifies as a "substantially limiting impairment." *Id.* GE Fanuc concedes that, without his hearing aid, plaintiff suffers from a disability within the meaning of 42 U.S.C. § 12102(2)(A), because his hearing impairment substantially limits a major life activity—hearing. GE Fanuc argues, however, that the question whether plaintiff is disabled under § 12102(2)(A) must take into account the relief provided by plaintiff's hearing aid. When equipped with the hearing aid, GE Fanuc asserts, plaintiff's hearing falls within a normal range, and, therefore, GE Fanuc contends, plaintiff should not be considered disabled under § 12102(2)(A).

This argument runs up against applicable EEOC regulations, which provide that disability must be determined without regard to ameliorative devices; the EEOC appendix offers the example of hearing aids as assistive devices which should not be taken into account when determining whether a person with hearing loss suffers from a disability that substantially limits major life functions. Appendix to 29 C.F.R. § 1630.2(h), (j). None of the cases GE Fanuc cites supports the opposite proposition (that ameliorative devices should be taken into account), nor does GE Fanuc directly challenge the regulations. Instead, GE Fanuc invokes the specter of expansive ADA liability it believes will result from the EEOC's position. Cautioning the court that failure to consider corrective devices will lead to a definition of disability that encompasses all employees who wear "glasses, contact lenses, ... back braces, wrist supports, or other unremarkable appliances and aids," GE Fanuc urges that the determination whether one is disabled by virtue of a hearing loss must factor in help provided by a hearing aid. Defs'. Brief at 20.

More than this type of speculative panic is required before the court is to disregard EEOC regulations. Courts have generally accorded wide deference to the EEOC's interpretive regulations, *see Meritor Savings Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986), and the cases unearthed by the court that consider this issue conclude that the EEOC's interpretation is entirely consistent with the statute and legislative history (and, in fact, mirrors the legislative history). *See Harris v. H & W Contracting Co.,* 102 F.3d 516, 520–22 (11th Cir.1997) (Carnes, J.); *Sicard v. City of Sioux City,* 950 F.Supp. 1420 (N.D.Iowa 1996). Moreover, this court has faith in the ability of federal courts to reject out-of-hand any patently ridiculous disability claims. *See, e.g., Fenton v. Pritchard Corp.,* 926 F.Supp. 1437, 1445 (D.Kan.1996) (rejecting claim that individual who easily lost his temper was disabled within the meaning of the ADA). Those who insist that any common human flaw rises to the level of disability, to the extent they are successful, dilute the strength of the ADA and rob truly disabled individuals of ADA protection. *See Forrisi v. Bowen,* 794 F.2d 931, 934 (4th Cir.1986). To assume that federal judges are incapable of understanding this is to do them an unjustified disservice. Hence, the court rejects GE Fanuc's suggestion that plaintiff's disability be determined by assessing his capabilities with a hearing aid, and holds that plaintiff has satisfied the first prong of the *Ennis* test.

### b. TERMINATION

There is no dispute that plaintiff was fired; therefore, the second *Ennis* prong is satisfied.

### c. JOB PERFORMANCE

The third prong of *Ennis* requires a showing that at the time of the discharge, plaintiff's job performance met the legitimate expectations of his employer. The Fourth Circuit has left little room for doubt that a disabled employee will not be insulated from discharge if he engages in misconduct. *See, e.g., EEOC v. Kinney Shoe Corp.,* 104 F.3d 683, 686 n. 3 (4th Cir.1997) ("[M]isconduct-even misconduct related to a disability—is not itself a disability, and an employer is free to fire an employee on that basis.") (citing *Tyndall* and *Little v. Federal Bureau of Investigation,* 1 F.3d 255 (4th Cir.1993)), *aff'g,* 917 F.Supp. 419 (W.D.Va.1996) (Michael, J.). In *Little* the Fourth Circuit invoked "no less authority than common sense" in emphasizing "that an employer subject to the Rehabilitation Act[, 29 U.S.C. § 701 et seq.] must be permitted to terminate its employee on account of egregious misconduct, irrespective

of whether the employee is handicapped." *Id.* at 259. Although the plaintiff in *Little* was an admitted alcoholic, and thus possibly governed by different rules than other disabled individuals, the principle articulated in *Little* applies to any employment context where an adverse employment action is taken against a disabled individual, and the adverse action is not taken because of the disability, but because of misconduct. To decide otherwise would bestow upon disabled individuals a perpetual, irrevocable license to misbehave with impunity, surely not a result envisioned by the ADA.

■ The record in this case unambiguously reveals that GE Fanuc's decision to terminate plaintiff was causally unconnected to his disability. His firing was not based on his failure to communicate with customers or other employees; it had no relation to plaintiff's ability to hear or to listen. Instead, an investigation, conducted by a supervisor (whom plaintiff has never accused of discrimination), led GE Fanuc to conclude that plaintiff had inappropriately conducted himself toward Ms. Lamb. In making this determination Ms. Sullivan–Rose and the other supervisors were confronted with a file documenting prior misconduct by plaintiff, backed up with warnings of termination upon recurrence. Even if Ms. Sullivan–Rose, and the supervisors whom she consulted, had been erroneous in crediting Ms. Lamb's version of events, there is no reason to suspect that the conclusion was not arrived at in good faith, which is all that is required. Thus, it is clear that, from GE Fanuc's perspective, plaintiff was not performing at the level of its legitimate expectations—for employers can reasonably and legitimately expect that their employees will not repeatedly harass or intimidate their colleagues. The court underscores that it is irrelevant whether in fact plaintiff was guilty of such conduct; it matters only that the employer subjectively believed that this was so. The ADA does not require courts to second guess employer's determinations of misconduct (e.g., whether an employer accurately concluded that an employee had misbehaved); rather, the ADA demands only that courts find that the employer's determinations were not driven by discriminatory intentions.

Plaintiff attempts to circumvent this rule by attributing discriminatory motivations to Ms. Lamb. In his deposition, plaintiff accuses Ms. Lamb of fabricating his violent reaction. Plaintiff's counsel, however, contradicts this explanation with an expedient alternative: Ms. Lamb misunderstood plaintiff's yelling— she interpreted it as anger, when in reality the raised voice was simply a function of plaintiff's inability to gauge the volume of his speech. But if Ms. Lamb fabricated plaintiff's aggressive behavior, then there was nothing for her to misunderstand. In any event, no evidence supports either the allegation that Ms. Lamb concocted the story or that she misjudged plaintiff's reaction. Evidence in the record belies both of these versions.

Ms. Lamb has worked with plaintiff for over ten years, and she testified that experience has taught her to distinguish between plaintiff's voice raised in anger and his inadvertent loudness stemming from hearing loss. Plaintiff's attorney, in her memorandum, makes heroic efforts to reconcile plaintiff's deposition testimony with her argument—which dangles before the court without a single shred of support— that Ms. Lamb mistook plaintiff's conduct as threatening and aggressive, when in fact plaintiff was simply gesticulating and pointing as hearing impaired people tend to do when they get excited or agitated. Counsel's theory cannot explain away the irreconcilable differences between plaintiff's and Ms. Lamb's perception of events, which are not related to one's ability to hear.

Similarly, plaintiff's charges of fabrication ring hollow when one recalls the undisputed fact that Ms. Lamb argued on plaintiff's behalf and convinced other supervisors to give him another chance in the face of sexual harassment charges against him. The Fourth Circuit has held that "there is a powerful inference ... that discrimination did not motivate the [defendant]" "when the hirer and firer are the same individual." *Tyndall,* 31 F.3d at 214–15. The parties quibble about whether the same inference should apply when a supervisor is neither the hirer nor the firer. The court need not

promulgate a blanket rule to decide the matter; regardless of whether such an inference is justified in all such cases, the court holds the inference should arise here. Any reasonable person would wonder why an individual would intervene on an employee's behalf, urging that he be given a second chance, knowing at the time that the employee suffered from a disability, only to lie a little while later with the hopes of getting the individual fired because of his disability. Plaintiff certainly has not offered any reason that would explain Ms. Lamb's turn around.

Given this uncontradicted evidence of misconduct, plaintiff has failed to demonstrate that he was meeting his employer's legitimate expectations at the time he was fired, a required showing under the third prong of the *Ennis* test. Based on this conclusion, GE Fanuc is entitled to summary judgment on plaintiff's claim that his termination violated the ADA. Although no further inquiry into the termination issue is required, the court notes that plaintiff cannot satisfy the fourth prong of the *Ennis* test for largely the same reasons that he fails under the third prong.

#### d. CIRCUMSTANCES OF DISCHARGE

The fourth and final prong under *Ennis* requires a showing that plaintiff's discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.

■ As discussed above, all too many leaps and unjustifiable inferences must be made before one can reasonably conclude that any causal connection exists between plaintiff's termination and his disability. Nothing in the record, apart from plaintiffs private speculation, provides any reason to believe there is such a connection. But "[m]ere unsupported speculation, such as this, is not enough to defeat a summary judgment motion." *Ennis,* 53 F.3d at 62 (citations omitted).

#### 3. LEGITIMATE, NONDISCRIMINATORY REASON AND PRETEXT

■ Even if plaintiff had successfully articulated a prima facie case of discriminatory discharge, he nonetheless would not be able to defeat GE Fanuc's motion for summary judgment on the termination claim. This is because plaintiff has adduced no evidence to show that GE Fanuc's legitimate nondiscriminatory reason for termination (misconduct) is a pretext for discrimination. Other than his own unfounded speculation, plaintiff has offered the court no evidence to support the claim that his discharge was related to his hearing impairment. Again, such speculation is simply insufficient to defeat summary judgment. The Fourth Circuit, probably with the hopes of curbing abusive and manipulative use of federal anti-discrimination statutes, has stated that *"a plaintiffs own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action."* *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 456 (4th Cir.1989) (emphasis added). This directive applies squarely to this case.

#### D. JOB DETRIMENTS OTHER THAN TERMINATION

The clear language of the ADA and the caselaw interpreting that language make plain that the ADA prohibits more than just unlawful termination; the ADA also covers various other discriminatory conduct, including a denial of job benefits because of disability. Given that the law is quite settled on this point, the court is puzzled at GE Fanuc's persistent refusal squarely to address all of plaintiff's claims relating to job benefits that he claims were denied him in violation of the ADA. Nevertheless, the copious discovery in the case permits the court to rule on plaintiff's claims without undue difficulty despite GE Fanuc's failure fully to grapple with some of the issues.

#### 1. PERFORMANCE EVALUATIONS

■ Plaintiff claims that as a result of allegedly discriminatory evaluations, he was placed on a monitoring schedule, and, consequently, denied the right to apply for different jobs within the company. As observed above, the ADA expressly includes within its definition of discrimination classifications based on disability (which lead to adverse job consequences). 42 U.S.C. .§ 12112(b)(1).

Adjusting the *Ennis* prima facie case for terminations to a prima facie case of failure to promote, plaintiff must show that (1) he is protected under the ADA; (2) he was classified on the basis of disability and suffered a job detriment; (3) his job performance at the time of the adverse employment action met the legitimate expectations of his employer; and (4) the circumstances surrounding the adverse employment action give rise to a reasonable inference of unlawful discrimination. If plaintiff succeeds in making out a prima facie case, GE Fanuc must articulate a legitimate, nondiscriminatory reason for the adverse employment action plaintiff suffered. Subsequently, plaintiff must show the reason to be false and a pretext for discrimination.

As discussed above, plaintiff meets the first prong of the test. For purposes of summary judgment, plaintiff also meets the second prong of the adjusted *Ennis* test. Plaintiff was criticized for poor "oral/written communication skills," for frequently repeating questions, for failing to follow directions, and for inability to remain calm and becoming over-excited. Pl's. Exhibit V. The court need not agree with plaintiff that each of these characterizations relates to his hearing impairment to find that plaintiff has presented sufficient evidence that he was classified on the basis of disability. As to the adverse employment action, it is agreed by both parties that plaintiff was denied the opportunity to post for jobs. Plaintiff cannot, however, jump the next two hurdles. Putting to the side the communication problems noted in plaintiff's evaluations, plaintiff nevertheless cannot show that his job performance met GE Fanuc's expectations. At the time plaintiff was denied access to promotions, he had been accused of attitude problems affecting relations with fellow employees and customers, "inappropriate and unacceptable behavior toward female colleagues," use of unauthorized overtime, insubordination, and refusal to follow directions. Pl's. Exhibit V. As the court has previously emphasized, an employer must be able to demand a certain standard of conduct from employees, disabled or not. An employee viewed by his employer as an insubordinate troublemaker does not, as a matter of law, satisfy an employer's legiti-

mate expectations pertaining to job performance. Nor do the circumstances surrounding plaintiff's placement on a monitoring schedule give rise to a reasonable inference of discrimination. Coming on the heels of plaintiff's problems with his supervisor and other employees, the monitoring period seems a mild alternative to immediate discharge. Indeed, by placing plaintiff on the monitoring period, GE Fanuc hoped to avoid terminating plaintiff. The concluding paragraph of the document reprimanding plaintiff demonstrates as much.

> We have had many discussions with Frank regarding his unacceptable behavior and performance over the years. If Frank is to continue his employment with GE F[anuc] he must immediately correct this behavior and demonstrate that these changes will be sustained over time. We will immediately put Frank on monitored performance and we will review his performance every 90 days and sooner if necessary. If we don not see a marked change in his behavior immediately for the better we will recommend his employment be terminated. In addition, any change for the better must be sustained over the life of Frank's employment or termination will again be recommended. In order to monitor Frank's performance he will be temporarily assigned to first shift. Frank needs to make sure he takes the two disciplinary letters in his file seriously. He should not make light of them.

Pl's. Exhibit V.

The case against plaintiff is made all the more compelling because of plaintiff's own statements to GE Fanuc regarding his hearing impairment. It must be recalled that plaintiff warned GE Fanuc in writing neither to state nor to imply that he was handicapped and represented that he believed his hearing had nothing to do with various problems he experienced at GE Fanuc. When he finally self-identified as handicapped, plaintiff gave GE Fanuc no reason to believe the handicap was affecting his work. On the form plaintiff filled out, he made no suggestion that his impairment was interfering with his ability to do the job. Subsequently, plaintiff refused to be examined by GE Fan-

uc's Health Center. Without plaintiff's cooperation, GE Fanuc could not be expected to adjust their evaluation system to plaintiff's needs, since it did not know what those needs were.

Moreover, the court is disturbed with the undertone of the argument presented by plaintiff's counsel, which equates hyperactivity, inattentiveness, and lack of cooperation with hearing loss. Although plaintiff presented some evidence on this issue—through Dr. McCay Vernon, an expert in the field—the Doctor's deposition testimony only states the obvious: that deaf or hearing impaired individuals may become frustrated or experience stress if they are misunderstood. Such testimony does not provide the requisite link between plaintiff's performance problems and his hearing loss, and it is a stretch to suggest that the responsibility for plaintiff's hyperactivity, inattentiveness, and lack of cooperation lies with plaintiff's hearing impairment.

Given the court's conclusion that plaintiff has failed to make out a prima facie case, the court need not explore subsequent stages of the *Ennis* test. Nonetheless, the court notes that for largely the same reasons as given on plaintiff's claim of unlawful discharge, plaintiff would fail were he permitted to go beyond the prima facie case. Hence, GE Fanuc is entitled to summary judgment on plaintiff's claim that he was adversely classified based on his disability in violation of the ADA. No reasonable fact-finder could conclude that GE Fanuc should be held liable under the ADA given the evidence adduced by the parties in this case.

### 2. WORK SHIFT TRANSFER

 The ADA became effective on July 26, 1992. *See* Pub.L. No. 101–336, Title I, § 108, 104 Stat. 327, 337 (1990). Only conduct occurring after this date is actionable under the ADA. *See Hinch v. Duncan,* 941 F.Supp. 62 (W.D.Va.1996) (Michael, J.). The allegedly discriminatory refusal to transfer plaintiff to the shift he desired cannot be redressed under the ADA because it occurred in 1990, well before the date on which the ADA became effective.[4] Plaintiff seems to insinuate that the effective date of the ADA should be disregarded in this case because GE Fanuc was subject to the Rehabilitation Act prior to 1992. *See* Pl's. Objections at 13 n. 6. Plaintiff cites no authority for this strange proposition, and the court can find nothing in the ADA to suggest that certain entities are subject to retroactive ADA liability depending on their status under the Rehabilitation Act. If plaintiff believes that GE Fanuc violated the Rehabilitation Act, his remedy is to pursue a cause of action under that statute, not under the ADA.[5] Consequently, GE Fanuc is entitled to summary judgment on plaintiff's claim that he was discriminatorily denied a shift transfer because of his disability.

### 3. TRAINING SESSIONS

It is clear from the evidence presented that no one seriously denied plaintiff entry into training sessions. While plaintiff alleges that his colleagues asked him why he would want to attend, given his hearing impairment, neither Ms. Lamb nor anyone else prevented him from attending such sessions. Plaintiff concedes as much. Such statements, if made, fall more comfortably into plaintiff's harassment claim, and they will be discussed with respect to that claim below. Insofar as plaintiff asserts that he was denied access to training sessions in violation of the ADA, this claim must be rejected.

### 4. REASONABLE ACCOMMODATION

 Because plaintiff did not present sufficient evidence that GE Fanuc fired plaintiff for any communication deficiency, the question whether defendants reasonably accommodated plaintiff drops away insofar as

---

4. Even if the consequences of the allegedly discriminatory refusal to transfer plaintiff persisted after July 26, 1992, plaintiff's claim would nonetheless be barred because the allegedly unlawful act itself occurred before the ADA became effective. *See Hinch v. Duncan,* 941 F.Supp. 62 (W.D.Va.1996) (Michael, J.)

5. That the ADA and the Rehabilitation Act proscribe the same type of conduct and should generally be interpreted consistently with one another is so well-established as to need no citation.

plaintiff's termination is concerned. Independent of the termination, however, the ADA mandates that covered entities provide reasonable accommodations to otherwise qualified individuals and failure to do so violates the law if it leads to adverse employment consequences. *See* 42 U.S.C. § 12112(b)(5)(A).

Although plaintiff presented evidence that it was common knowledge at GE Fanuc that he was hearing .impaired, *see* Snopkowski Affidavit, Norstrom Affidavit, he did not identify himself as disabled by virtue of hearing loss until March 12, 1991. Not all individuals who wear hearing aids are necessarily disabled, or, even if they are, this is not something that would be obvious to a lay person. Hence, knowledge of a hearing impairment is not tantamount to knowledge of a disability, much less knowledge that an accommodation is needed. The ADA carefully guards against such assumptions, and, in fact, attempts to prohibit them to some degree. *Cf.* 42 U.S.C. § 12112(d)(4)(A) ("A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.").

Before March 12, 1991, when GE Fanuc suggested plaintiff go to Health Center to be examined for his hearing problem, plaintiff declined and warned GE Fanuc that it would be "inappropriate to mention or imply that I am handicapped." Def's. Exhibit 12. At that stage, GE Fanuc could only insist that he was handicapped at its own peril, for to do so against the express wishes (however misguided) of its employee would subject the company to charges that it was patronizing a disabled individual and engaging in demeaning stereotyping. When plaintiff finally decided to self-identify as handicapped, he made no formal request to GE Fanuc for accommodation, indicating only that he used a phone amplifier and wore a hearing aid.

GE Fanuc replied that plaintiff should visit its Health Center, but he declined. Plaintiff offers no evidence to contradict this documentation.[6]

Instead, he asks the court to impose an obligation on employers that far exceeds the expectations of the ADA. Under his construction of the ADA, employers would be burdened with ferreting out disabled individuals. Such a duty, however, would itself come dangerously close to violating the ADA, which directs that employers "shall not make inquiries of an employee as to whether ... an employee is an individual with a disability, *unless such examination or inquiry is shown* to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A) (emphasis added). This prescription implies that the burden would be on the *employer* to demonstrate that the examination or inquiry was proper.

A case from the Seventh Circuit confirms the need for affirmative action on the part of the disabled individual before an employer can be held liable for inaction.

Once an employer knows of an employee's disability and the employee has requested reasonable accommodations, the ADA and its implementing regulations require that the parties engage in an interactive process to determine what precise accommodations are necessary. In this case, the interactive process broke down. The employer was left to guess what actions it should take, and the employee was left frustrated that her disability was seemingly not accommodated. Liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown. But where, as here, the employer does not obstruct the process, but instead makes reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed, ADA liability simply does not follow.

---

6. Plaintiff does offer irrelevant testimony by Dr. Vernon that describes the natural reluctance of hearing impaired individuals to come to terms with their loss. True as this may be, defendants

should not suffer ADA liability because plaintiff was unduly reticent in communicating his problem, however "natural" his timidity may be.

*Beck v. University of Wisconsin Board of Regents,* 75 F.3d 1130, 1137 (7th Cir.1996).[7]

Based on this reasoning, even if Ms. Lamb's responses to plaintiff's requests for a better phone amplifier were inadequate—she merely cleaned the old phone amplifier[8]—and even if plaintiff was never supplied with the additional phone ringer for which he asked,[9] GE Fanuc cannot be held liable for these deficiencies in light of plaintiff's denial of handicap and subsequent refusal to cooperate with GE Fanuc by visiting the Health Center. Therefore, GE Fanuc is entitled to summary judgment on plaintiff's claim that its failure to provide him with a reasonable accommodation violated the ADA.

### E. HARASSMENT BASED ON DIS-ABILITY

■ Disability-based harassment is a beast of relatively recent origins; the Fourth Circuit has had little opportunity to speak on this type of claim, although other courts have recognized the cause of action and articulated the standards a plaintiff must meet in order to proceed on a claim of disability-based harassment. Not unexpectedly, courts have analogized harassment based on disability to hostile work environment claims under Title VII, 42 U.S.C. § 2000e *et seq.* As with sexual harassment claims, courts are stem, and the threshold showing is high. "For comments to rise to the level of adverse employment action, the conduct must be so egregious as to 'alter the conditions of employment.'" *Henry v. Guest Services, Inc.,* 902 F.Supp. 245 (D.D.C.1995) (quoting *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)); *Mannell v. American Tobacco Co.,* 871 F.Supp. 854 (E.D.Va.1994). The harassment must be shown to "create[ ] an objectively hostile or abusive work environment...." *Mannell,* 871 F.Supp. at 860 (citing *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

In *Henry,* the plaintiff suffered from depression and, as a result, was allegedly subjected to mockery by his coworkers, who on one occasion placed a Peanuts cartoon in plaintiff's mailbox to taunt him. The court found that while the conduct endured by plaintiff was insulting, it did not rise to the requisite level of severity so as to change plaintiff's conditions of employment.

On the other hand, the court in *Haysman v. Food Lion, Inc.,* 893 F.Supp. 1092 (S.D.Ga. 1995), found that a plaintiff with emotional problems and back injuries was entitled to proceed on his claim of disability-based harassment in light of allegations that (1) his coworkers ridiculed him concerning his chances of returning to management after his back surgery; (2) his store manager berated him in front of other employees for "snowballing" the company with his disability; (3) the assistant manager told him that he "would break him" and that he was going to "ride him" until he quit; (4) the assistant manager used extreme profanity against him; and (5) the assistant manager would strike or kick injured portions of his body. 893 F.Supp. at 1097–98. *See Davis v. York International Inc.,* 1993 WL 524761 (D.Md. 1993) (unpublished) (holding that defendants were not entitled to summary judgment when plaintiff, afflicted with MS, alleged that they "mimicked and ridiculed her speech and gait, two traits that her MS had affected, perpetuated and enhanced myths about plaintiff and MS, fostered an atmosphere of resentment and pity among plaintiff's coworkers, blamed plaintiff for office staffing problems and errors she did not make, threatened to remove her special computer equipment, hovered over her excessively while at work, and denigrated her abilities both in private and in front of fellow employees").

In the case at bar, the evidence in the record indicates that plaintiff's relationship

7. Plaintiff argues that the court should disregard plaintiff's failure to engage in the interactive process because it took place prior to the effective date of the ADA. This argument confuses the date on which liability could be imposed under the ADA with evidentiary matters. To find otherwise would be effectively to impose a requirement that GE Fanuc make the same inquiries and overtures to plaintiff after passage of the ADA that it had made before. This would be senseless.

8. Ms. Lamb contends plaintiff expressed satisfaction with the result.

9. Ms. Lamb contends plaintiff was supplied with one phone ringer and never requested another.

with Ms. Lamb and Keith Chambers was, at times, acrimonious. Even assuming, however, that the comments plaintiff attributes to Ms. Lamb and Keith Chambers were actually made by them, and made with malice, the remarks were not so severe and pervasive as to alter plaintiff's work conditions. To ask a hearing-impaired individual why he would want to attend a training session or to otherwise make fun of the hearing impairment through signs and commentary is infantile and ignorant. Unfortunately, however, it appears that human beings are not infrequently inclined toward infantile and ignorant behavior; federal law lacks sufficient strength to overcome such conduct. The ADA only holds employers liable for such behavior when it actually affects job conditions. However much plaintiff was stung by the comments directed at him, they simply do not rise to the requisite level of severity.

Plaintiff attempts to breath life into his harassment claim by including within it his poor performance evaluations and GE Fanuc's alleged failure to provide him with a reasonable accommodation for his hearing impairment. No reasonable person could believe, given the evidence in this record, that plaintiff's poor performance evaluations or any alleged failure to accommodate could be characterized as harassment.

Plaintiff's situation shares far more in common with the plaintiff in *Henry* than with the claimant in *Haysman* or even *Davis*. As in *Henry*, at best plaintiff has alleged "conduct that sporadically wounds or offends but does not hinder an employee's performance." *Henry*, 902 F.Supp. at 252 n. 9 (internal quotations and citations omitted). Therefore, summary judgment must issue in favor of GE Fanuc on plaintiff's disability harassment claim.

### III. CONCLUSION

For the reasons stated above, all of plaintiff's claims against defendants must be dismissed.

An appropriate Order shall this day issue.