Lois A. BENSON, Plaintiff,

v.

**E.I. DU PONT DE NEMOURS & CO., Defendant.**

Civ.A. No. 5:00CV00095.

United States District Court,
W.D. Virginia,
Harrisonburg Division.

Jan. 25, 2002.

Timothy Earl Cupp, Cupp & Cupp, P.C., Harrisonburg, VA, for plaintiff.

Robert Craig Wood, Lori S. Thomas, McGuire, Woods, Battle & Boothe, Charlottesville, VA, for defendant.

### MEMORANDUM OPINION

MICHAEL, Senior District Judge.

This matter comes before the court on the defendant's motion for summary judgement in this action for wrongful termination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq. The above-captioned civil action was referred to the presiding United States Magistrate Judge for proposed findings of fact, conclusions of law, and a recommended disposition. See 28 U.S.C. § 636(b)(1)(B). The Magistrate Judge returned his Report and Recommendation on November 14, 2001, recommending that the court deny the defendant's motion for summary judgement. The defendant timely filed objections to the Report and Recommendation, to which the plaintiff responded. The court has performed a *de novo* review. See 28 U.S.C. § 636(b)(1)(C). Having thoroughly considered the entire case and all relevant law, the court is in agreement with the Report and Recommendation and, for the reasons stated herein, shall deny the defendant's motion for summary judgement.

## II.

These facts are expressed in the light most favorable to the plaintiff as the non-moving party.[1] *See Myers v. Finkle,* 950

---

1. On November 29, 2001, the plaintiff filed "Objections to Certain Factual Findings in the Magistrate Judge's Report and Recommenda-

tion." The plaintiff objects to some portions of the Magistrate Judge's recitation of facts,

F.2d 165 (4th Cir.1991). In 1984, the plaintiff, Lois A. Benson ("Benson"), began working as a keyboard operator for the defendant, E.I. Dupont De Nemours & Co. ("Dupont"), in its Waynesboro, Virginia plant. For over 14 years she worked without incident and, by 1998, had received numerous merit pay increases and had been promoted to the position of quality assurance technician. However, on August 26, 1998, Benson suffered a stroke with a concurrent seizure while at work and was admitted to the hospital.

Following her stroke, Benson sought and was approved for medical disability leave from DuPont during the period of her recuperation and rehabilitation. That rehabilitation included extensive physical and speech therapy to counteract the effects of the stroke. In March 1999, Benson's approved leave was extended by DuPont upon a report[2] from Thomas Spicuzza, M.D., Benson's treating neurologist, indicating that Benson soon would be able to return to work, but that some additional treatment was necessary. After working part-time during March 1999 with the assistance of a speech therapist, Benson returned to her full-time position at DuPont on April 12, 1999.

Benson's return to work was not without difficulty. Because, as a result of her stroke, Benson had a tendency to transpose numbers communicated to her verbally, Dr. Spicuzza had requested that all work requests be sent to Benson in written form. However, according to the plaintiff, some of the engineers with whom Benson worked refused to give her information in writing, stating that they were trying to train her to comprehend instructions conveyed over the phone. The failure of these engineers to provide Benson with written instructions apparently caused Benson substantial stress.

According to the testimony of some of her co-workers, Benson began using profanity excessively while on the job. However, Benson asserts that she directed no profanity at her co-workers, and that the use of obscene language in the factory setting in which she worked was common. In addition to the allegations regarding profanity, one co-worker reported that Benson had threatened to kill herself and another with whom she worked. Specifically, soon after her return, Benson received notice from DuPont Credit Union official Jim Fields that she would be terminated from her part-time position on the Credit Union's credit committee. Subsequently, Benson, upset over her termination from the credit committee, told her co-worker, Richard Jones, that she might kill Jim Fields and then herself. However, according to the plaintiff, this statement was made in jest, and even Richard Jones indicated that, based on his 30 year relationship with Benson, the statement did not appear to be a serious threat.

On April 14, 1999, Brian Teerlink ("Teerlink"), plaintiff's supervisor, began investigating allegations made by co-workers that Benson had exhibited inappropri-

---

arguing that they are not set forth in the light most favorable to the plaintiff. To the extent that the plaintiff's objections have merit, the court has amended the facts presented by the Magistrate Judge. However, in most instances, the plaintiff has objected not on the basis that the facts presented are in error, but because the plaintiff feels that the recitation does not go into sufficient detail regarding evidence supporting the plaintiff's position. While the court will consider all of the facts available in making a determination on the motion now before it, and consider the evidence in the light most favorable to the plaintiff, explicit reference to all of these facts in the instant summary is unnecessary.

2. This report was preceded by letters from Dr. Spicuzza to DuPont in January and February 1999 indicating that the appropriate target date for Benson's return to work was April 1, 1999.

ate conduct at work. Due to recent highly publicized shootings in private workplaces, Teerlink claims he was especially concerned about the statements Benson had made with regard to killing Jim Fields. After several other employees purportedly corroborated the allegations made against Benson, Teerlink met with the DuPont management team to discuss an appropriate response to the plaintiff's behavior. The DuPont management team included David Snyder, a physician's assistant and health services manager, John Thomas, M.D., an employee assistance consultant, as well as Walker Norford and Willie Scott, human resources managers.

The management team considered subjecting Benson to an independent evaluation, and initiated a call to Dr. Spicuzza to ascertain his view of the situation. Dr. Spicuzza indicated that he did not believe the situation was as serious as it was being treated, and warned that escorting the plaintiff out of the workplace in front of her colleagues for the purpose of sending Benson to a psychological evaluation could exacerbate Benson's already fragile emotional state. Dr. Spicuzza also opined that an additional evaluation was not necessary, but if DuPont insisted on such, Dr. Spicuzza recommended that Dr. Christine McDowell evaluate Benson. However, because Dr. McDowell was not available at the time DuPont chose to have the evaluation, an appointment was set with Dr. Joseph Conley, an neuropsychologist, to assess Benson the next day.

The next morning, April 15, 1999, Teerlink and Scott met with Benson and representatives of her union. Benson was informed of the allegations against her and the defendant's desire to subject her to an independent medical evaluation. While Benson denied making any threats to kill Fields, according to Teelink's testimony, she agreed to submit to Dr. Conley's evaluation. After the meeting, Benson was escorted by the DuPont management team off the plant facility and sent home. Later that day, she accompanied DuPont personnel to Dr. Conley's office for a medical evaluation.

Dr. Conley reported that Benson had "significant cognitive dysfunction," inhibitory dysfunction, deficiencies in information retrieval, and a tendency to misunderstand what was being said to her. He asserted that persons with Benson's condition often were profoundly depressed and hyper-aroused, a state which would lead to "catastrophic reactions" like the "episodes of intense anger, characterized by tensing, flushing red, trembling, spewing expletives and yelling" that Benson's co-workers claimed to have observed. While Dr. Conley believed that Benson's condition would improve over the next few years, he concluded that her current position at DuPont was too complicated and recommended that she be given a new assignment. Nevertheless, Dr. Conley noted that Benson was not a threat to herself or others.

Based on Dr. Conley's report, Teerlink sought to determine whether Benson could be placed in a less complicated position. Teerlink subsequently indicated that another assignment may have been available for Benson, but such position would have involved shift work and substantial retraining. In fact, the plaintiff suggests that the other position to which Teerlink alluded was significantly more complex and stressful than Benson's assignment as a quality assurance technician. Teerlink then determined that Benson "either needed to return to work or be terminated." (Def's. Supp. Mem. Summ. J. at 6.) However, because Dr. Conley and Dr. Spicuzza disagreed as to whether Benson could return to work, Teerlink suggested to Benson that DuPont arrange for a third medical opinion. Benson reluctantly agreed.

On June 10, 1999, Benson was evaluated by Dr. McMahon, a neurologist. Dr. McMahon issued a written report on that same date in which he questioned the reliability of Dr. Conley's earlier evaluation of Benson due to the traumatic nature in which she was removed from her workplace prior to her appointment with Dr. Conley. Nevertheless, Dr. McMahon stated that, absent additional supportive therapy and intervention, he did not recommend that Benson return full-time to her quality assurance position at DuPont.

On June 29, 1999, the Dupont management team met and decided to terminate Benson's employment. Teerlink advised Benson of DuPont's decision on July 1, 1999. According to Teerlink's own notes, during this meeting he made clear to Benson that she was being terminated because of her disability, not because of her job performance. The following day, as Benson was gathering her personal effects, Teerlink also told the plaintiff that he never considered her an actual threat to other DuPont employees. Thereafter, Benson applied for and received Social Security disability benefits as well as benefits from DuPont's disability plan. On November 28, 2000, Benson instituted the current action, and on August 31, 2001, the defendant filed the motion for summary judgement now before the court.

### III.

A motion for summary judgement should be granted only if there is no genuine dispute as to an issue of material fact and the moving party is entitled to judgement as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[S]ummary judgment or a directed verdict is mandated where the facts and the law will reasonably support only one conclusion." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (quoting *McDermott Int'l, Inc. v.*

*Wilander*, 498 U.S. 337, 356, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991)). If the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party, then there are genuine issues of material fact. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 (1986). All facts and reasonable inferences that can be drawn therefrom must be interpreted in the light most favorable to the non-moving party. *See Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir.1990). However, the non-movant may not rest upon mere allegations and denials of the pleadings, and must assert more than a "mere scintilla" of evidence in support of her case in order to survive an adverse entry of summary judgement. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

### IV.

#### A. *Ordinary Proof Standard v. McDonnell Douglas Standard*

Title I of the ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... discharge of employees ... and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The Fourth Circuit has developed two alternative schemes for analyzing claims under the ADA, depending upon whether the employer disclaims reliance on the disability in making its adverse employment decision. *See EEOC v. Kinney Shoe Corp.*, 917 F.Supp. 419, 424 (W.D.Va.1996), *aff'd, Martinson v. Kinney Shoe Corp.*, 104 F.3d 683 (4th Cir.1997).

If the employer disclaims reliance on the disability, and instead offers other reasons for its adverse action, then the burden-shifting scheme established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) is employed. Under

this approach, a plaintiff must first present sufficient evidence that establishes, by a preponderance of the evidence, a prima facie case of discrimination. A plaintiff can establish a prima facie case of discrimination under *McDonnell Douglas* by showing that (1) she was in the protected class; (2) she was discharged; (3) at the time of the discharge, she was performing her job at a level that met her employer's legitimate expectations; and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the plaintiff satisfies its initial burden of establishing a prima facie case, the burden shifts to the defendant to come forward with evidence of a legitimate and non-discriminatory reason for the employment decision. *Id.* When such a non-discriminatory reason is put forth, the inference of discrimination disappears and the plaintiff must then prove, by a preponderance of the evidence, that the reasons proffered by the defendant were a pretext for intentional discrimination. *Id.*

In cases in which the employer does not disclaim reliance on the disability, the purpose of the *McDonnell Douglas* test, determining the reason for the adverse employment action, will have been achieved at the outset. *See White v. York Int'l Corp.*, 45 F.3d 357, 361 n. 6 (10th Cir.1995) (discussing a derivation of the *McDonnell Douglas* test and its inapplicability to cases in which the employer acknowledges consideration of the employee's disability). Thus, in this type of case, a more direct, three-prong test, developed in *Tyndall v. National Educ. Ctrs.*, 31 F.3d 209, 212 (4th Cir.1994), is utilized. Under this test, a plaintiff must establish that (1) she has a "disability;" (2) she is a "qualified individual;" and (3) in "discharging[ing]" her, the employer "discriminate[d] against her because of her disability." *See Kinney Shoe*

*Corp.*, 104 F.3d at 686; *Tyndall*, 31 F.3d at 212.

In the instant case, the following note was written by Teerlink to record matters discussed at the meeting between Benson and the management team to address the plaintiff's termination.

> Jim [the union representative] then asked, "Let me get this straight, you are discontinuing her because you have no job for her on the site because of her disability?" I said that is correct. . . . Jim then reminded her that she is not being terminated for poor performance but because of a disability. That she needs to fill [sic] good about herself, the work she did and walk proudly back to her work area to pick up her things. I said that I agreed with Jim . . . .

The Magistrate Judge determined that, given this direct evidence that the defendant terminated Benson because of her disability, this case should be analyzed not under the *McDonnell Douglas* framework, but rather the three-prong standard used in *Tyndall*. The defendant objects, arguing that the Magistrate Judge misinterpreted its motivation for terminating Benson, and that when the note upon which the Magistrate Judge relied is "properly placed in context, it is clear that plaintiff's termination was *not* 'because she was disabled,' but rather was 'because she could not perform the essential functions of her job,' which was a complex, sensitive position at DuPont." (Def's. Opp'n to R & R at 8.)

The court finds that the statement relied on by the Magistrate Judge was intended to communicate not that Benson was being terminated merely because she had a disability, but rather that she was terminated because her disability had caused her to exhibit inappropriate conduct at work. That is, given the context in which the statement was made, it appears the state-

ment at issue was meant to convey to the plaintiff that, absent the effects of the stroke, over which she had no control, she was a competent employee, and thus she should leave DuPont with her pride intact. The fact that Benson was told that "she needs to fill [sic] good about herself, the work she did and walk proudly back to her work area to pick up her things" supports this interpretation. Nevertheless, while the statements made during Benson's meeting with the management team do not support a finding that Benson was terminated merely because she had a disability, the Magistrate Judge's decision to use the *Tyndall* standard instead of the *McDonnell Douglas* approach was correct. This is because the latter criterion is appropriate only where the employer denies that the plaintiff's disability was a basis for the adverse employment decision. In this case, the defendant plainly acknowledges that the effect Benson's disability had on her ability to do the job led to her termination.

## B. *Application of the Ordinary Proof Standard*

■ Benson must show that (1) she has a "disability;" (2) she is a "qualified individual;" and (3) in "discharging[ing]" her, the employer "discriminate[d] against her because of her disability." *Tyndall*, 31 F.3d at 212. Upon a review of these factors, the court finds that the plaintiff has established a genuine issue of material fact, requiring this court to deny the defendant's motion for summary judgment.[3]

The defendant concedes for the purposes of the current motion that Benson qualifies as "disabled" under the ADA and thus satisfies the first prong of the *Tyn-*

3. The defendant asserts that, because it offered the plaintiff alternatives to discharge, she did not suffer an adverse employment action and thus does not qualify for protection under the ADA. The defendant alleges that Benson was offered three choices: (1) transfer to an administrative position in the nylon spinning department; (2) at Dr. McMahon's suggestion, engage in three to six months of occupational, speech and psychological therapy and then see if she is able to return to her previous job; or (3) discontinue her employment and apply for disability income under DuPont's medical pension program. In *Lawson v. Principi*, 2001 WL 987788, at *3 (W.D.Va. Aug. 21, 2001), another court in this district held that a nurse with severe back problems had not suffered an adverse employment action when her employer sent her a letter giving her a choice between disability retirement and reassignment as a medical clerk, a position that required less moving and thus would put less stress on the plaintiff's back. However, the court's decision was based in part on the fact that, while the letter said these were the plaintiff's only options, she was in fact permitted to continue to work as a nurse in light duty status until her physician cleared her for performance of full nursing duties. In the case now before this court, while the plaintiff was allegedly offered another position, evidence indicates that the position suggested was more complex, and likely to lead to more stress, than the quality assurance position. Because the complexity and stress of the quality assurance position apparently contributed to Benson's behavioral problems, offering her an even more complex position would be analogous to offering the plaintiff in *Lawson* a heavy lifting job, and thus cannot be considered a reasonable alternative. Furthermore, this court does not consider dispositive the defendant's claim that it offered Benson an opportunity to undergo three to six months of therapy per Dr. McMahon's suggestion. Benson had just completed many months of intensive therapy and according to Dr. Spicuzza, the doctor arguably in the best position to evaluate the plaintiff's status, needed only limited consultation with Dr. McDowell or someone of similar expertise to address the residual stroke effects she was experiencing. To force Benson to chose between terminating her employment or enduring another six months out of work to engage in intensive therapy did not provide Benson with a reasonable alternative. For this reason, the court rejects the defendant's argument that Benson did not suffer an adverse employment action.

*dall* standard. Furthermore, because the defendant admits to having discharged Benson based on the effect the stroke had on her work performance, Benson satisfies the third prong of this standard. In *Kinney Shoe,* this court granted summary judgement for an employer in an ADA case in which the plaintiff alleged to have been discharged because he had epilepsy. The court reasoned that since the plaintiff had been discharged not because he suffered from the general disability of epilepsy but rather because of the specific attributes of the plaintiff's specific form of the disability, i.e., his seizures, the plaintiff could not prevail on the third prong. *See EEOC v. Kinney Shoe Corp.,* 917 F.Supp. 419, 430–31 (W.D.Va.1996). However, the Fourth Circuit rejected this court's conclusion, stating the following:

> When an employer concededly discharges an employee because of a disability, the employee need prove nothing more to meet the third prong of the prima facie test. *See Rizzo v. Children's World Learning Ctrs.,* 84 F.3d 758, 762 (5th Cir.1996). [The defendant] concededly discharged [the plaintiff] because of his "[s]eizures in store, sales floor, and stockroom" and his "[i]nability to control timing of the same." To fire for seizures is to fire for a disability.... Whether [the defendant] fired [the plaintiff] because he suffered from epilepsy or because of the "specific attributes" of his disease, i.e., his seizures, is immaterial—both are disabilities and an employer may not use either to justify discharging an employee so long as that employee is qualified to do the job. *Kinney Shoe,* 104 F.3d at 686.

Similarly, in the current case, while the defendant denies having discharged the defendant solely because she is a stroke victim, the defendant concedes that it fired Benson because of the alleged effects/attributes of her stroke. Therefore, for the purposes of summary judgement, the only

issue that remains is whether Benson is a "qualified individual."

In its memorandum supporting the current motion, the defendant applied *McDonnell Douglas* instead of the *Tyndall* standard to the facts of the current case. In reference to the first *McDonnell Douglas* element, the defendant stated that it "concedes for the purposes of this motion only that plaintiff is within the protected class." (Def's. Mem. Supp. Summ. J. at 11 n. 4.) The Magistrate Judge determined that this statement served as a concession that Benson both is disabled and a "qualified individual," thus satisfying the first and second prongs of the *Tyndall.* In support of this interpretation, the Magistrate Judge cited the Fourth Circuit's opinion in *Haulbrook v. Michelin North America, Inc.,* 252 F.3d 696, 702 (4th Cir. 2001), in which the Court stated that "one is within the ADA's *protected class* if one is a '*qualified individual* with a disability.'" (emphasis added) The defendant objects to the Magistrate Judge's conclusion, asserting that it intended to concede only that Benson is disabled, not that she is a "qualified individual." The defendant argues that it has maintained throughout this action that Benson was not qualified to perform the essential functions of her job, and that the Magistrate Judge disregarded the defendants' stated position using "a semantic sleight of hand." (Def's. Opp'n to R & R at 2.)

As the Magistrate Judge noted, the first prong of the *McDonnell Douglas* test, whether the plaintiff is within the protected class, has two components. First, it must be established that the plaintiff has a "disability" as defined by the ADA and, second, the plaintiff must show that he is a "qualified individual." *See Haulbrook,* 252 F.3d at 702; *Ennis v. Nat'l Ass'n of Bus. and Educ. Radio, Inc.,* 53 F.3d 55, 59 (4th Cir.1995). Thus, viewing the defendant's

concession alone, the Magistrate Judge was correct in his assertion that by admitting the first prong of *McDonnell Douglas*, the defendant in effect conceded that Benson is a "qualified individual." However, when the defendant's concession is considered in the context of the remainder of the memorandum, it appears that the defendant did not intend to admit that Benson was a "qualified individual," and that it merged its discussion of this element with its analysis of the third *McDonnell Douglas* factor—whether, at the time of the discharge, the plaintiff was performing her job at a level that met the defendant's legitimate expectations. In fact, the defendant stated in addressing this third prong that the plaintiff's alleged misconduct at work led it to "conclude [that] she was unable to perform the essential functions of her job." (Def's. Mem. in Supp. at 12.) This language specifically incorporates the ADA definition of a "qualified individual" as one who "can...perform the essential functions of the employment position that such individual holds." 42 U.S.C. § 12111(8). While the separate enumeration of prongs 1 and 3 of the *McDonnell Douglas* test suggests that these two elements were not intended to be identical, the analysis required to determine whether a plaintiff is a "qualified individual" often converges with that under the third prong. *Pouncy v. Vulcan Materials Co.*, 920 F.Supp. 1566, 1582 (N.D.Ala.1996) (stating that the requirement that a plaintiff be a "qualified individual" "parallels the third element of the prima facie case, i.e., the plaintiff was performing her job at a level that met her employer's legitimate expectations at the time of her discharge."). In fact, the Fourth Circuit has often considered under the first prong of *McDonnell Douglas* only whether the plaintiff is disabled, and left issues related to whether the plaintiff is a "qualified individual" for discussion under the third prong. *See, e.g., EEOC v. Town & Coun-*

*try Toyota, Inc.*, 7 Fed.Appx. 226, 2001 WL 369675 at *1 (4th Cir.2001) (unpublished) (equating whether plaintiff is within the protected class with whether he is "disabled"); *Ennis*, 53 F.3d at 60–61 (addressing only whether plaintiff was "disabled" under first prong of *McDonnell Douglas*, then evaluating whether defendant was performing job at level meeting defendant's legitimate expectations). In this context, the defendant's explanation regarding its concession of the first *McDonnell Douglas* prong is understandable.

However, irregardless of whether the defendant in fact conceded the second *Tyndall* factor, Benson has produced evidence sufficient at least to raise an issue of fact as to whether she was qualified for her job despite the effects of her stroke. The ADA defines a "qualified individual" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The plaintiff bears the burden of establishing that she is a qualified individual with a disability by showing:

> (1) whether she "could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue," and (2) if not, whether "any reasonable accommodation by the employer would enable [her] to perform these functions." *Tyndall*, 31 F.3d at 213 (quoting *Chandler v. City of Dallas*, 2 F.3d 1385, 1393–94 (5th Cir. 1993)).

In arguing that Benson was unqualified and not meeting legitimate expectations, the defendant focuses almost entirely on Benson's alleged incidences of misconduct in the workplace. The defendant makes no reference to performance issues related specifically to Benson's quality assurance

position, except for Teerlink's assertion that he had learned from one of Benson's co-workers, Susie Henderson ("Henderson"), that the plaintiff's work production was low and contained errors. This revelation contradicted Teerlink's own observation that Benson "seeme[d] to be picking up fast her old work assignment." (Teerlink's notes of 3/23/99 regarding Benson.) Furthermore, Henderson stated in deposition testimony that Benson did not make that many mistakes, and that Henderson's concern was Benson's ability to "deal with people." (Henderson Dep. at 60.) While Benson had some difficulty transposing numbers communicated to her verbally, both parties agree that this problem was easily accommodated by providing Benson with instructions containing numbers·in writing. As Teerlink suggests in his deposition testimony, concern regarding Benson's alleged behavioral misconduct, and not performance issues, led the defendant to investigate and eventually terminate the plaintiff. (Teerlink Dep. at 15.)

The defendant states that "it was because of [Benson's] admitted misconduct and two fitness for duty evaluations that [the defendant] concluded she was unable to perform the essential functions of her job." (Def's. Mem. Supp. Summ. J. at 12.) One of the defendant's primary concerns was Benson's alleged tendency to become easily frustrated and, as a result, use excessive profanity. Specifically, Teerlink was notified by Henderson that Benson would on occasion become frustrated over minor issues and, as a result, use profanity. Henderson focused on an incident in which Benson became extremely upset over the time it took for cafeteria workers at the DuPont plant to prepare her cheese sandwich. Based on Benson's outburst on this occasion, and others like it, Henderson expressed concern regarding Benson's ability to interact with her co-workers and the potential that Benson would experi-

ence another stroke. The alleged threat Benson made with regard to DuPont employee Jim Fields added to this concern.

While one can speculate that Benson's alleged tendency to become easily frustrated could effect her job performance, there exists no evidence to suggest that, at the time of her termination, Benson's productivity had been significantly effected. Thus, the crux of the defendant's argument appears to be that the ability to interact appropriately with her co-workers was an essential function of Benson's job, and that Benson had exhibited an inability to do so. However, even if it is assumed that an ability to interact with co-workers is an essential function of the quality assurance technician position, and that Benson was unqualified to perform that function, it may be that the defendant could have provided a reasonable accommodation that would address its concerns and yet allow Benson to keep her job.

"Even if a disabled person is unable to perform the essential duties of an employment position, [her] termination may nevertheless be unlawful if the employer has failed to reasonably accommodate the employee's disability." *Myers v. Hose*, 50 F.3d 278, 282 (4th Cir.1995). Dr. Spicuzza, who had been treating Benson since August 1998, told the defendant after being notified of its concerns regarding the plaintiff that the problems described were not unusual, and that they could be addressed by having Benson meet with a psychologist, preferably Dr. Christine McDowell. Because McDowell was not immediately available, the defendant brought Benson to Dr. Conley for a series of neuropsychological tests. While Dr. Conley's report was not favorable regarding Benson's return to work, his findings were dubious according to both Dr. Spicuzza and Dr. McMahon, the second doctor the plaintiff was sent to by the defendant,

due to Benson's emotional state when Dr. Conley performed his tests. Specifically, prior to her appointment with Dr. Nelson, Benson had been ushered out of the plant by the defendants in a humiliating fashion, despite Dr. Spicuzza's warning that removing Benson in this manner would cause her severe emotional distress. When Benson arrived at Dr. Nelson's office, she was distraught. As Dr. Spicuzza suggests, "putting [Benson] through a battery of tests...in that emotional state was just ridiculous." (Spicuzza Dep. at 21.) Furthermore, Dr. Spicuzza questioned Dr. Nelson's professional ability and stated that, because Benson had been subjected to similar tests within the previous two or three months, Dr. Nelson's tests were inaccurate. (*Id.* at 20.) Dr. Spicuzza explained that, due to the learning effect of neuropsychological testing, repeating that testing within at least six months renders the test invalid. *Id.*

As Dr. Spicuzza explained to the defendant, as a result of her stroke, Benson had "resorted to right hemisphere automatic speech instead of taking the time she need[ed] to process language...particularly verbal expressive language from the left hemisphere." This explains why Benson was prone to verbal outbursts, including her comment regarding Jim Fields. Dr. Spicuzza told the defendant that Benson could learn to control these outbursts through limited counseling with Dr. McDowell, but the defendant made no attempt to make this suggested accommodation, and dismissed Benson on the basis of an evaluation of questionable validity. While the defendant claims to have made an attempt to accommodate Benson by offering her a another position within DuPont's nylon

spinning department, evidence indicates that the position suggested was more complex, and likely to lead to more stress, than the quality assurance position. Therefore, this "alternative" assignment did not qualify as a reasonable accommodation because it was "insufficient to meet the job-related needs of the individual being accommodated." [4] 29 C.F.R 1630.9 app.

Finally, while there exist issues of fact with regard to whether the defendant failed to reasonably accommodate Benson, "an individual is not otherwise qualified if he poses a significant risk to the health and safety of others by virtue of the disability that cannot be eliminated by reasonable accommodation." *Doe v. Univ. of Maryland Medical Sys. Corp.,* 50 F.3d 1261, 1265 (4th. Cir.1995). Similarly, if an employee poses a danger to herself, she is not deemed to be "otherwise qualified." 29 C.F.R. § 1630.2(r) App. The defendant was appropriately concerned regarding Benson's statement that she should kill Jim Fields. However, the defendant acknowledged that this statement was most likely a manifestation of Benson's stroke-induced reliance on right hemisphere automatic speech, rather than an accurate account of Benson's intentions. (Letter from Thomas to Spicuzza of 4/22/99; *see also* Teerlink's notes of 4/14/99 at 2.) In fact, Teerlink told Benson upon her termination that he "never believed she posed a danger to anyone." [5] (Teerlink's notes of 7/7/99 at 7.) Furthermore, while Benson's co-worker, Henderson, expressed concern that the plaintiff's agitated state could lead to another stroke, this concern was not shared by Dr. Spicuzza, who had treated Benson for some time and was in the best position

---

4. See *supra* note 3 for further discussion regarding whether the defendant provided Benson with reasonable accommodation.

5. Benson's statement regarding Jim Fields was accompanied by her remark that she

should kill herself. For the same reason that Benson's statement regarding Jim Fields should not be given undue weight, neither should her statement regarding suicide be dispositive.

to make such a judgement. Thus, while Benson was experiencing on occasion extreme frustration, it is not clear that she posed a danger to herself.

## V.

In accordance with the foregoing, the Report and Recommendation shall be accepted and the defendant's motion for summary judgment shall be denied. An appropriate order shall this day enter.

### *ORDER*

For the reasons stated in the accompanying Memorandum Opinion, it is accordingly this day

### ADJUDGED ORDERED AND DECREED

as follows:

(1) The November 14, 2001 Report and Recommendation of the Magistrate Judge shall be, and hereby is, ACCEPTED.

(2) The defendant's August 31, 2001 Motion for Summary Judgment shall be, and hereby is, DENIED.

The Clerk of the Court hereby is directed to send a certified copy of this order and the accompanying Memorandum Opinion to all counsel of record and to Magistrate Judge Crigler.