**Desiree C. NANETTE, Plaintiff**

v.

**John SNOW, Secretary, Department of Treasury, Defendant**

**No. RWT 03–CV–925.**

United States District Court, D. Maryland.

Oct. 29, 2004.

Jeffrey Lawrence Sheldon, The Sheldon Law Firm, Laurel, MD, for Plaintiff.

Thomas M. DiBiagio, Kirk L. Dobbins, John W. Sippel, Jr., Allen F. Loucks, Jamie M. Bennett, Office of the United States Attorney, Baltimore, MD, for Defendant.

## MEMORANDUM OPINION

TITUS, District Judge.

Plaintiff, Desiree C. Nanette, brings this employment discrimination action against John Snow, Secretary, Department of Treasury, the entity that oversees her former employer, the Internal Revenue Service ("the IRS"), pursuant to the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 *et seq.*, alleging claims of failure to accommodate and disparate treatment. Presently pending and ready for resolution are Defendant's Cross–Motion to Dismiss or, in the Alternative for Summary Judgment and Plaintiff's Cross–Motion for Summary Judgment. For the reasons that follow, the court will grant Defendant's Cross–Motion for Summary Judgment and deny Plaintiff's Cross–Motion.

## I.

Nanette began her employment with the IRS in 1982, as a seasonal, taxpayer service representative. Pl.'s Cross–Mot. Summ. J. Ex. 1 (Nanette Dep. at 35). From 1983 to 1993, Nanette worked as a revenue officer. In 1993, she became a program analyst in the Information Systems Division of the IRS, the position she held at the time she was discharged on June 11, 1999. As a program analyst, Nanette's responsibilities included gathering information, analyzing the material, drafting documents and transmitting reports to the appropriate individuals. *See* Def.'s Cross–Mot. Summ. J. Ex. 11 (Nanette Dep. at 28).

In 1996, Nanette worked at the IRS' Rosslyn, Virginia, work site. In May of that year, she developed a respiratory condition that caused her to be absent from work for most of three months. Her condition was allegedly triggered on or about May 7, 1996, by a chemical spill (overflow of the men's room and seepage of the overflow) that contaminated the ventilation system at the Rosslyn facility. Her symptoms allegedly included severe headaches, memory loss, confusion and various other ailments.

In late 1996, as part of the effort by the IRS to consolidate its operations, Nanette's work location was changed from Rosslyn, Virginia, to the New Carrollton Federal Building ("NCFB" or "the New Carrollton building") in Lanham, Maryland. In March of 1997, she asserted that she could not work at NCFB because environmental stimuli present there exacerbated her multiple medical conditions, including asthma, reactive arthritis and chemical sensitivity, Pl.'s Cross–Mot. Summ. J. at 7, "caus[ing her] to be unusually sensitive to irritants found in and around office buildings such as construction dust, cleaning chemicals and fumes, air fresheners, pesticides, parking lot and car fumes, and 'off gassing.'" *Id.* at 12.[1] Based on the alleged exacerbation of her medical condition, she took two weeks of sick leave. Def.'s Cross–Mot. Summ. J. Ex. 11 (Nanette Dep. at 96). *Id.* However, Nanette did not return to work after the two-week sick leave ended. Instead, in a letter dated April 20, 1997, and in response to a request from Dave Williams, her then supervisor, for a written statement of accommodations requested by her, she wrote, in part:

> You requested a written statement of accommodations. I would like accommodations that do not make me sick. My current understanding of what won't make me sick is as follows: no cleaning chemicals used when I am present, good clean fresh air circulation, not located near a copier, no perfumes, no colognes to be used by individuals in my area, no new carpets, carpet glue, no recent paint, or new furniture, windows that open to the outside, no building construction currently being done, and anything else that my doctor might be aware of that I have left out of this letter. The contact with the above listed items is not limited to my work area but to the elevator, lobby and any other environment I must come in contact with from my car to the work area.

Pl.'s Cross–Mot. Summ. J. Ex. 14. The letter concluded by requesting an advance of sick leave as follows: "[d]ue to extensive medical symptoms and doctors appointments I am requesting that you advance me sick leave until the workman's compensation ruling." *Id.*

---

1. Nanette explains that "off gassing" is the process whereby chemicals are released naturally from almost all manufactured materials. Pl.'s Cross–Mot. Summ. J. at 12 n. 2.

Nanette's physician, Dr. Leila H. Zackrison, wrote an undated letter to the IRS doctor, Dr. Presant, referencing a visit of April 18, 1997, stating that Nanette's reactive arthritis "had done quite well on antibiotic therapy with near resolution of all her symptoms until some time in January after a move to the New Carrollton Building .... [when] she reported exposure to poor air circulation, chemicals, fumes and other building construction material." *Id.* Ex. 7. Dr. Zackrison concluded:

> As long as hazardous material are avoided, 100% recovery is expected. She will always be at risk of having flares from various triggers, which would include environmental, food and infectious processes but, the current flare [sic] caused by the fumes exposure, should resolve without any residual deficit. This assumes that her new work situation is such that there are no exposures to chemicals, various cleaning agents, fumes, paint and that the cleaning crew perform their jobs after hours when the employee is not present.

*Id.*

In response to Nanette's claims of numerous medical conditions and symptoms, the IRS attempted to accommodate her. During her absence, the IRS offered Nanette transfers to facilities in Crystal City and Bailey's Crossroads, in Virginia. Def.'s Cross–Mot. Summ. J. Ex. 11 (Nanette Dep. at 162–172). Nanette recalls that the IRS made the transfer offers "pretty close to each other." *Id.* at 172. Nanette visited each location to test whether the buildings were acceptable to her. *Id.* at 163 and 166. After spending a few hours, at the most, at each location she found the facilities unacceptable. *Id.* at 164 and 166. The IRS also referred Nanette for an interview for a position at Tyson's Corner, one of her desired locations. After being interviewed for the position, however, she was not selected for the job. Pl.'s Cross–Mot. Summ. J. at 20.

The IRS also considered retrofitting a computer room as an office for Nanette. *Id.* at 20–22. In a letter dated September 3, 1997, Dr. Grace Ziem, one of Nanette's physicians, listed nine accommodations at NCFB "that would have to be resolved before [Nanette] is able to attempt this." *Id.* at Ex. 8. Specifically, Dr. Ziem wrote:

> You have suggested that she use the computer room in Building B. There are still multiple problems with Building B that would have to be resolved before she is able to attempt this. These include the following accommodations: 1) Removal of air fresheners from bathrooms she would use[;] 2) An activated charcoal air filter with the capacity to filter all of the space and emitted contaminants from the computer room. The design and capacity of this model needs to be approved by an expert in field: Jim Nigra (818–889–6877) or Natalie Golas (301–279–0488)[;] 3) No petrochemicals or pesticides used in the patients area or any area she would use or walk through[;] 4) No cleaning products containing petrochemicals or irritants such as ammonia or chlorine in the patient's work area or area she would need to walk through[;] 5) A window that opens in case of a problem building exposure that she could not rapidly escape[;] 6) Permission to leave the building in case of unanticipated exposure[;] 7) Advance notification when there will be *any* pesticide use in this building or any building sharing air supply with this building[;] 8) Provision for the patient to eat in a nontoxic area ... [;] 9) Education of fellow employees regarding scented products.

*Id.* In that letter, Dr. Ziem also requested that Nanette be allowed "to work from her home since she has experienced severe

disabling symptoms in [NCFB] and since all buildings were renovated using roughly the same materials at the same time." *Id.*

Nanette remained absent from work for eight months, from April through November of 1997. In November she returned to work at the NCFB location for approximately six to seven weeks through Christmas. Def.'s Cross–Mot. Summ. J. Ex. 11 (Nanette Dep. at 178 and 185). Then, claiming that her symptoms had resurfaced, Nanette stated that she had to leave the building. She refused to return to NCFB and remained absent from work for the next twelve months.

One of Nanette's physicians, Dr. Zackrison, in a letter related to a doctor's visit on December 9, 1997, wrote, "[c]urrently for medical reasons, she is counseled not to return to the New Carrollton building and requests to transfer to another building or to be able to telecommute are strongly suggested." Pl.'s Cross–Mot. Summ. J. Ex. 5.[2] Soon thereafter, in another one-paragraph letter referencing a visit of December 12, 1997, Dr. Zackrison wrote:

> Nanette has developed a well-documented clinical medical illness that is caused and exacerbated by environmental exposures at [NCFB]. Exposure to these environmental trigger has been serious enough to cause her reactive airway disease, dermatitis, inflammatory arthropathy, malar rash, fatigue and general ill feeling. It is medically necessary that all exposure to the environment of the New Carrollton building be discontinued indefinitely. Even part-time exposure causes significant exacerbation of her medical illness.

*Id.* Ex. 12. Dr. Zackrison's letter concluded by stating, "[i]t is felt to be medically necessary that [ ] Nanette be transferred to Tysons (or any other work site that has no deteriorating affect [sic] on her medical status) and that this be instituted immediate." *Id.*

In a filed memorandum dated December 19, 1997, Dr. Zackrison wrote, "(e)very additional exposure to · the New Carlton [sic] building leads to worsening of her respiratory and musculoskeletal symptoms." *Id.* Ex. 10. The letter also stated, "[s]he is not sure but there is possible similar symptoms but probably not to the same extent at [NCFB] in the Tysons building." *Id.* Dr. Zackrison recommended "environmental avoidance of triggers." *Id.*

Dr. John M. Balbus, another physician, wrote in a letter dated December 23, 1997, that he had evaluated Nanette "pre- and post-exposure upon her return to work place ... in November." *Id.* Ex. 18. The letter explained that during an office visit on December 2, 1997, Nanette "noted ... hip pain, painful fingers, painful knees and ankles, swollen lymph nodes, a stuffy runny nose, memory problems and headaches." *Id.* The letter observed that a physical exam found "some puffiness ... to her face.... mild swelling of the ankles and wrists.... no frank arthritis...." *Id.* The letter also states that laboratory testing revealed "no significant laboratory abnormalities." *Id.* Dr. Balbus recommended that Nanette "not return to her present work place" and concluded "[i]t is possible that [ ] Nanette will have similar reactions in other work places. I believe,

---

**2.** The letter also states:
> She was totally asymptomatic prior to her exposure. There appears to be a causal relationship. Continued or persistent exposure potentially can do great harm that potentially could cause irreversible damage

and long term suffering from a chronic connective tissue disease. It is not surprising that the laboratory data do not reflect her current level of symptoms.

Pl.'s Cross–Mot. Summ. J. Ex. 5.

however, that is it [sic] medically indicated that she have a trial of working in different work places that do not have a history of indoor air problems or poor ventilation." *Id.*

A one-page letter dated January 8, 1998 from Dr. Zackrison observed that Nanette "continued to be symptomatic with persistent exposure to her usual environmental triggers at the New Carrollton Building." *Id.* at Ex. 5. The doctor noted that the IRS had "not made accommodations" and that Nanette "[p]ersists with fatigue, arthralgias, glandular swelling, paresthesias, memory difficulty, sense of shortness of breath, SICCA symptoms and an intermittent sore throat[ ] and [h]eadaches are also variable." *Id.*

While absent from work in 1998, Nanette began pursuing permanent disability retirement. In a letter dated July 10, 1998, Dr. Alan R. Vinitsky concluded that "unless her employer faithfully and without hesitation actively seeks to provide a safe environment, Ms. Nanette should be granted a disabled retirement." Pl.'s Cross–Mot. Summ. J. Ex. 9. Dr. Vinitsky's report also noted:

> In addition, given her reactivity to substances which are known to be used in her workplace (scented cleaning products, for example), the demand for time constraints, travel requirements, and diverse social interactions, it is extremely likely that Ms. Nanette will frequently react to her environment at New Car-

rollton and will fatigue or relapse at the present time.

*Id.* Nanette's claim for permanent disability was denied.

In October of 1998, the IRS directed Nanette to return to work at the NCFB location by October 19, 1998. Pl.'s Cross–Mot. Summ. J. Ex. 30 (stating, "[y]ou have been continuously absent from the office since January 16, 1998. Your prolonged absence from the office has placed an undue hardship on the Branch"). The IRS subsequently extended the deadline for Nanette to report to work to January 4, 1999. *Id.* On January 4, 1999,[3] Nanette wrote to the IRS stating, "[m]y doctor has not released me to return to work at [NCFB].... If I return to [NCFB] as you demand I could suffer irreversible damage." *Id.* Ex. 15. Nanette requested a month long extension of the deadline by which the IRS had directed her to return to work and restated her request for a transfer as an accommodation. *See id.* By the end of February, Nanette had not returned to work.

In a letter dated February 23, 1999, the IRS directed that Nanette return to work at NCFB by March 8, 1999. Pl.'s Cross–Mot. Summ. J. Ex. 30. The letter also notified her that "efforts to secure a reassignment outside of [NCFB] have been unsuccessful." *Id.* The IRS subsequently extended the deadline for Nanette to return to work to April 19, 1999. *Id.* On April 27, 1999, the IRS notified Nanette of its intent to discharge her.[4] *Id.* at Ex. 31.

---

**3.** This letter contained in the record is dated January 4, 1998. However, a thorough review of the record more accurately reflects that the letter was written in 1999. *See* Pl.'s Cross–Mot. Summ. J. at 30. Specifically, the letter requests an extension of the January 4, 1999 deadline by which she was to return to work, as the IRS directed in a letter dated December 16, 1998. *See id.* Thus, Nanette could not have requested an extension on January 4, 1998, when the IRS's deadline was

not communicated to her until almost a year later in December of 1998. Accordingly, the record does not support, as Nanette claims in her motion, that on January 4, 1998 she "again asked for a transfer" formally in writing. *See* Pl.'s Cross–Mot. Summ. J. at 15.

**4.** The letter reads, in part:

Agency records reveal that you have been absent in excess of 1828 hours during the

Nanette responded in a letter dated May 6, 1999, "I am able to perform the duties of my position. I am asking to work from another location. I am sure arrangements can be made and workable conditions can be arrived at if we work together." *Id.* Ex. 17. When Nanette did not return to work, the IRS discharged her effective June 11, 1999. *Id.* Ex. 32.[5]

## II.

The parties have filed cross motions for summary judgment.[6] Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion" and "demonstrat[ing] the absence of a genuine issue of material fact." *Young v. Prince George's County, Maryland,* 355 F.3d 751, 754 (4th Cir.2004) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Upon such a showing, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

In satisfying this burden, the nonmoving party must support the asserted claims with evidence that is significantly probative. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, "[a] mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely." *Barwick v. Celotex Corp.,* 736 F.2d 946, 958–59 (4th Cir.1984) (citations omitted). The nonmoving party's failure to set forth such evidence renders summary judgment appropriate. *Young,* 355 F.3d at 755.

## III.

Nanette maintains that under the circumstances presented, where she was fired for being unavailable for work and she was unavailable because the New Carrollton building made her sick, "there is no need to apply the burden shifting scheme from *McDonnell Douglas[ Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ] . . . because there is no dispute as to the reason for [her] discharge." Pl.'s Cross–Mot. Summ. J. at 37. Rather, she argues that "this case presents the direct questions of whether the discharge violated the law because [the IRS] failed to accommodate [her] disabilities, . . . and whether [the IRS] treated her differently

period August 4, 1996 through January 16, 1998. Additionally, from January 19, 1998 to the present—over one year—you have not reported for duty. In a letter dated October 8, 1998, after learning that your request for disability retirement had been disapproved by OPM, I directed you to return to the workplace by October 19, 1998. You did not return to duty. However, as indicated in my January 4, 1999 letter to you, that return to duty date was extended until January 4, 1999, in order for you and this office to explore possible reassignment opportunities. Your written response, dated January 4, 1999 requested an additional extension, to February 4, 1999, to which I agreed. Then, in a letter dated April 6, 1999 I informed you that no

reassignment opportunities had been found, and directed you to return to the workplace by April 19, 1999. To date, you have not returned to duty and there is no indication that you will return to work in the foreseeable future. Pl.'s Cross–Mot. Summ. J. Ex. 31.

5. This letter references a letter from Nanette dated May 28, 1999. The record does not contain a copy of that letter.

6. Alternatively, the Defendant moves for dismissal of Nanette's claims. Because the Motion relies upon matters outside the pleadings, it will be treated in all respects as a motion for summary judgment.

than similarly-situated, non-disabled program analysts." *Id.* Assuming that the burden-shifting scheme of *McDonnell Douglas* is inapplicable, as she argues, because the reason for her discharge, i.e., her unavailability, is undisputed, Nanette has nonetheless failed to show that the discharge violated the law.[7]

 The basic tenet of the Rehabilitation Act of 1973,[8] which governs employee claims of disability discrimination against the federal government, is that the government must take affirmative steps to accommodate the handicapped, except where undue hardship would result. *See* 29 C.F.R. § 1614.203; *Barth v. Gelb,* 2 F.3d 1180, 1183 (D.C.Cir.1993). The law prohibits discrimination against "a qualified individual with a disability" with respect to "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."

*Id.* § 12111(8). In order to establish a violation under the Rehabilitation Act, a plaintiff must prove: "(1) that [s]he has a disability; (2) that [s]he is otherwise qualified for the employment or benefit in question; and (3) that [s]he was excluded from the employment or benefit due to discrimination solely on the basis of the disability." *Doe v. Univ. of Maryland Medical Sys. Corp.,* 50 F.3d 1261, 1265 (4th Cir.1995) (citations omitted).

 The Court quickly disposes of Nanette claims of disparate treatment. Nanette claims that she was treated differently than similarly-situated employees outside her protected class, that is, non-disabled. She contends that "many program analysts were allowed to work from home," and references eleven program analysts who were allowed to work from home on specific days of the week or a specific number of hours a week, i.e., every Monday and the third Friday of each month. *See* Pl.'s Cross–Mot. Summ. J. at 28 and Ex. 27. However, Nanette points to no employee who was allowed to work from home full-time, as she requested as an accommodation. *See id.; see also* Pl.'s Cross–Mot. Summ. J. Ex. 4 (McGarry Dep. at 27).

---

7. "The *McDonnell Douglas* test is designed to circumvent a factual dispute over the reasons for discharge, and is therefore most appropriate when the defendant disavows any reliance on discriminatory reasons for its adverse employment action." *Williams v. Channel Master Satellite Sys., Inc.,* 101 F.3d 346, 348 n. 1 (4th Cir.1996) (internal quotations and citations omitted). Nonetheless, traditional burdens of proof still apply. In *Barth v. Gelb,* 2 F.3d 1180, 1186 (D.C.Cir.1993), the D.C. Circuit articulated the following approach for cases where the employer's determination that the employee was not qualified for a particular position takes into consideration reasons related to the employee's disability. There the court stated:

These cases deal with objective claims that may be tested through the application of

traditional burdens of proof .... [A] plaintiff must establish that (a) he is handicapped but, (b) with reasonable accommodation (which he must describe), he is able to perform the "essential functions" of the position he holds or seeks. *See* 29 C.F.R. § 1613.702(f); *see also id.* § 1613.704(a), (b). As in the usual case, it would then be up to the employing agency to refute that evidence. The burden, however, remains with the plaintiff to prove his case by a preponderance of evidence.

*Barth,* 2 F.3d at 1186.

8. In 1992 Congress amended the Rehabilitation Act to incorporate the substantive standards of the Americans with Disabilities Act, which is not otherwise applicable to federal employees. *See Rhoads v. Fed. Dep. Ins. Corp.,* 257 F.3d 373, 388 n. 13 (4th Cir.2001).

Thus, although the Rehabilitation Act prohibits disparate treatment, *see Cathcart v. Flagstar Corp.*, 1998 WL 390834, *9, 1998 U.S.App. LEXIS 14496 at * 28, she has presented no evidence that *any* other employee was permitted to work from home on a full time basis as she requested as an accommodation.

■ The Court now turns to Nanette's claim that the IRS violated the Act by failing to accommodate her. A failure to accommodate claim under the Rehabilitation Act requires the plaintiff to establish: (1) that she was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of her disability; (3) that with reasonable accommodation she could perform the essential functions of the position; and (4) that the employer refused to make such accommodations. *Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 387 (4th Cir.2001) (citations omitted). The first[9] and second elements are not at issue in this case.

■■ As to the third element, the IRS argues that Nanette is not a "qualified individual with a disability" because Nanette is not able to perform essential functions of the program analyst job. A person must be able to "perform the essential

functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue" with reasonable accommodation. *Tyndall v. Nat'l Educ. Ctrs., Inc. of California*, 31 F.3d 209, 213 (4th Cir. 1994). The plaintiff bears the burden of demonstrating that she could perform the essential functions of her job. *Id.*

■ The essential functions of the program analyst position require office meetings, personal interaction with customers and travel. *See* Def.'s Cross–Mot. Summ. J. Ex. 14 (job description). These essential functions were recognized in Dr. Vinitsky's report to the Disability and Special Entitlements Division, dated July 10, 1998, which explained:

> In addition, given her reactivity to substances which are known to be used in her workplace (scented cleaning products, for example), *the demand for time constraints, travel requirements, and diverse social interactions*, it is extremely likely that Ms. Nanette will frequently react to her environment at New Carrollton and will fatigue or relapse at the present time.

Def.'s Cross–Mot. Summ. J. Ex. 9 (emphasis added).

---

9. With respect to the first element, under the Rehabilitation Act, an individual with a disability is one who: "(i) has a physical impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such impairment; or (iii) is regarded as having such an impairment." 29 C.F.R. § 1614.203(a). As to the first element, though the IRS now argues that Nanette is not disabled, in its Answer, the IRS admitted that Nanette is disabled. Paragraph 45 of the Complaint, reads:

> These impairments substantially limit Plaintiff in several major life activities including breathing, walking, using her hands, sleeping, concentrating and thinking, working, and enjoying life. However, Plaintiff can perform the essential functions of her job with reasonable accommodation.

Compl. ¶ 45. In its Answer to paragraph 45, the IRS responded:

> 31. The allegations of Paragraph 45 are denied, *although defendant admits that plaintiff's impairments substantially limit her in several major life activities,* but states that it does not have information sufficient to form a belief as to whether the plaintiff is limited with regard to each of the activities listed in this paragraph of the Complaint.

Answer ¶ 31.

Without deciding whether the IRS's Answer amounted to an admission that Nanette was disabled under the statute, the Court will assume that Nanette was an individual with a disability under the Rehabilitation Act.

It is clear that Nanette's job could not be fully performed from home. According to the testimony of Clegg Holliday, Nanette's last official supervisor, though she was on leave at that time, meetings were a required part of the job, and the job could not be done efficiently or effectively from home. Def.'s Cross–Mot. Summ. J. Ex. 15 (Holliday Dep. at 143). Nanette's own witness, Donato Casucci, who was the Branch Chief when she returned to work in 2001, admitted that a function of program analysts was to meet with clients, and that such would be more difficult if the interaction was by phone. Def.'s Cross–Mot. Summ. J. Ex. 28 (Casucci Dep. at 58–60). As explained in *Tyndall*, "[e]xcept in the unusual case where an employee can effectively perform all work-related duties at home, an employee who does not come to work cannot perform any of his job functions, essential or otherwise." *Tyndall*, 31 F.3d at 213 (internal quotations omitted). Because Nanette's job required some level of office attendance, some travel and diverse social interactions, even if the IRS could have provided an office with a door and a window that could be opened or telecommuting, Nanette would not have been able to perform certain essential functions of her job.

With respect to the fourth element, which Nanette maintains is the crucial element, she argues that the IRS failed to make reasonable accommodations for her condition by failing to offer a safe office environment in which to work, by rejecting the telecommuting alternative and by not reassigning her to a vacant position.

The record indicates that the IRS did not implement its "Flexiplace" program, which allowed employees whose job description allowed them to be away from the workplace to work from home, until 2002. Although the program was available informally to programmers, it was not available to program analysts, such as Nanette in 1997 or 1998. *See* Def.'s Cross–Mot. Summ. J. Ex. 20 (Haines Dep. at 45). In addition, the IRS at that time "did[ not] have the equipment that would allow [telecommuting]." Pl.'s Cross–Mot. Summ. J. Ex. 4 (McGarry Dep. at 23). Moreover, as Robert McGarry testified, "the other part of the equation was that [Nanette] could[ not] come into the office at any time." *Id.* at 27. Clegg Holliday, Nanette's official "first in line supervisor" in early 1999, when she was on leave, also testified that he did not think that the job of program analyst could be done efficiently or effectively from home. *See* Def.'s Cross–Mot. Summ. J. Ex. 15. (Holliday Dep. at 143–145).

Nanette references the fact that when she was reinstated to her position pursuant to the interim MSPB award in her case in 2001,[10] she was allowed to work from home for approximately eleven months with the aid of a laptop, a printer, and a "secured dial-in line." *See* Def.'s Cross–Mot. Summ. J. Ex. 28 (Casucci Dep. at 59–67). While such accommodation may have been possible in 2001, the record indicates that such was not available in 1997, 1998 or 1999, the relevant time period. *See EEOC v. Stowe–Pharr Mills, Inc.,* 216 F.3d 373 (4th Cir.2000) (stating, "[o]f course, the date of an adverse employment decision is the relevant date for determining whether a plaintiff is a 'qualified individual with a disability'"). Nanette's own witness, Donato Casucci, who was the Branch Chief when she returned to work in 2001, admitted that a function of program analysts was to meet with clients, and that such would be more difficult if the interaction was by phone. *Id.* at 58–60. While many of the duties of the program

---

10. That decision was overturned on appeal.

analyst position could be performed from home, the job also required that she participate in office meetings and conduct field visits to clients. Thus, the program analyst job was not one that could effectively be effectively performed entirely from home, as Nanette's accommodation required.

When Nanette first took leave in March of 1997, and requested a transfer from NCFB, the IRS offered her a transfer to two locations, Crystal City and Bailey's Crossroads. Def.'s Cross–Mot. Summ. J. Ex. 11 (Nanette Dep. at 162–172). She first visited the Crystal City location to "test the building" for two to three hours. *Id.* at 166. She experienced muscle and joint pain thereafter. *Id.* Nanette testified that to get to the Crystal City location she had to go through an underground garage, a mall, a nail salon and a dry-cleaning business. *Id.* Nanette could not determine whether the reaction was due to the office space or to the surroundings she had to cross to get to the building. *Id.* at 168 (stating, "[y]our reaction to a chemical isn't always immediate. It can be 24 hours later or even longer, so the reaction I had, I'm not sure if it was that office space … or what I had to go through to get to that building").

When Nanette informed the IRS that the Crystal City location was unacceptable, the IRS offered a transfer to Bailey's Crossroads. *Id.* at 171—72, 163—64. Although she remembers that the Bailey's Crossroads building was "not acceptable," as the building's air freshener caused her to have a headache, she does not remember whether she was in the building for a day or for a few minutes. *Id.* at 163–64.

When the IRS explored the option of retrofitting a computer room for Nanette, in a letter dated September 3, 1997, Dr. Grace Ziem, one of Nanette's physicians, requested nine accommodations that would

have to be made to the room "before [Nanette] is able to attempt this," including a professionally approved activated charcoal air filter, a window that opens, and a non-toxic eating area. Pl.'s Cross–Mot. Summ. J. Ex. 8. The IRS also had apprehensions about the success of the retrofit in eliminating harmful environmental stimuli. Specifically, the record contains notes from Nanette's supervisor Clegg Holliday where he expressed several concerns, including: half of the floor that housed the computer room would remain under construction until the end of December 1997; "periodic electrical and mechanical construction work done in the immediate area;" the computer room housed a "large Uninterruptible Power Supply system with batteries that outgas to some extent;" "the computer equipment itself gives off odors from time to time;" and approximately 100 people have access to that room on a regular basis. *See id.* Ex. 24. The IRS's decision not to proceed with the retrofit was not unreasonable in light of the fact that Nanette's doctor indicated that such would be only an "attempt" and in light of the IRS's own concerns that the project would not eliminate all environmental stimuli.

Nanette requested a transfer to 1111 Constitution Avenue. That option, however, was not available because the building was undergoing asbestos renovation at that time. Pl.'s Cross–Mot. Summ. J. Ex. 13 (Lehman Dep. at 10). Nanette's contention that neither she nor her doctors were asked "whether asbestos would be a problem for her" is devoid of merit. In a letter dated December 15, 1997, Sheli S. Hairston, a Licensed Vocational Rehabilitation Provider with the Virginia Department of Rehabilitative Services, recommended that Nanette have a trial period of working in a setting with "no neighboring construction, which produces dust and

stirs up other airborne chemicals." *See* Pl.'s Cross–Mot. Summ. J. Ex. 19.

Lastly, it is also significant that Nanette's physicians were uncertain that any other work site could accommodate her conditions. For example, in 1997, Dr. Zackrison requested that Nanette be transferred to the Tyson's location or to "any other work site that has no deteriorating affect [sic] on her medical status." *Id.* Ex. 12. In a subsequent letter, Dr. Zackrison wrote "[Nanette] is not sure but there is possible similar symptoms but probably not to the same extent at [NCFB] in the Tyson's building." *Id.* Ex. 10. Another physician, Dr. Balbus wrote "[i]t is possible that [ ] Nanette will have similar reactions in other work places." *Id.* Ex. 18.

Considering all of the foregoing, it merits repeating what was observed by the Merit Systems Protection Board in its Opinion and Order entered on August 7, 2002. Def.'s Cross–Mot. Summ. J. Ex. 3, pages 16—17:

> "After considering all of the evidence discussed above, we find that the appellant's requested accommodations are, on their face, unreasonable. In fact, it is difficult to fathom an office environment wherein the articulated accommodations could be satisfied in total, let alone a federal office building that could be accessed via a chemical-free portal extending from the appellant's parking space to her work space. Indeed, the appel-

lant's own physician, Dr. Alan Vinitsky, concluded that it was 'unlikely' the agency could 'find an appropriate safe place for her to work, given the degree of her dysfunction.' [citations omitted] The fact that the appellant testified that she is capable of working in an office environment where several of her requested accommodations have been provided does not prove that the laundry list of accommodations she has requested of the agency was reasonable."

With regard to the issue of whether Nanette could safely perform the essential functions of her position, the Merit Systems Protection Board observed that "in light of the breadth of the appellant's requested accommodations, the difficulty in preventing an accidental exposure, the dire consequences associated with such an exposure, and the unpredictable nature of her working environment, we find that the appellant has failed to demonstrate that she can safely perform the essential functions of her position." *Id.* at page 18.

Based upon the uncontroverted facts in this record, the court concludes that Nanette has failed to demonstrate that with reasonable accommodation she could perform the essential functions of her position. While Nanette's medical condition is obviously unfortunate, it is one for which reasonable accommodations simply could not be made under the circumstances of this case.[11]

---

11. Nanette also argues that the IRS was required to offer to reassign her to another position, citing the provisions of former 29 C.F.R. § 1614.203(g) which provides:

> When a nonprobationary employee becomes unable to perform the essential functions of his or her position even with reasonable accommodation due to a handicap, an agency shall offer to reassign the individual to a funded vacant position located in the same commuting area and serviced by the same appointing authority, and at

the same grade or level, the essential functions of which the individual would be able to perform with reasonable accommodation if necessary unless the agency can demonstrate that the reassignment would impose an undue hardship on the operation of its program. In the absence of a position at the same grade or level, an offer of reassignment to a vacant position at the highest available grade or level below the employee's current grade or level shall be required, but availability of such a vacancy

## CONCLUSION

For the reasons stated above, Defendant's Cross–Motion to Dismiss or, in the Alternative for Summary Judgment will, by separate order, be Granted and Plaintiff's Cross–Motion for Summary Judgment will, also by separate order, be Denied.

### *ORDER*

Upon consideration of Plaintiff's Cross–Motion for Summary Judgment [Paper No. 15], Defendant's Cross–Motion for Summary Judgment [Paper No. 16], the oppositions thereto, the arguments presented by counsel at a hearing held before the undersigned on July 22, 2004, and for the reasons stated in the accompanying Memorandum Opinion, it is, this 29th day of October, 2004, by the United States District Court for the District of Maryland,

**ORDERED**, that Plaintiff's Cross–Motion for Summary Judgment [Paper No. 15] is **DENIED**; and it is further

**ORDERED**, that Defendant's Cross–Motion for Summary Judgment [Paper No. 16] is **GRANTED**; and it is further

**ORDERED**, that **JUDGMENT** for costs be entered in favor of Defendant, John Snow; and it is further

**ORDERED**, that the clerk is directed to CLOSE THE CASE.

shall not affect the employee's entitlement, if any, to disability retirement pursuant to 5 U.S.C. 8337 or 5 U.S.C. 8451.

The problem with Nanette's position is that the accommodations she has requested are, as the court has already concluded, unreasonable on their face. Accordingly, as did the

Merit System Protection Board, this court concludes that Nanette's "arguments concerning the agency's obligations to identify vacant, funded positions to which she could be reassigned need not be addressed." Def.'s Cross–Mot. Summ. J. Ex. 3, page 20.